# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47438

JEFFREY MARSALIS, )
)
    Petitioner-Appellant, )          Boise, January 2020 Term
)
v. )          Opinion filed: February 18, 2020
)
STATE OF IDAHO, )          Karel A. Lehrman, Clerk
)
    Respondent. )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Jonathan P. Brody, District Judge.

The judgment of the district court is <u>affirmed in part, reversed in part, and remanded</u>.

Silvey Law Office, Ltd., Boise, for Appellant. Greg S. Silvey argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Kenneth K. Jorgensen argued.

---

MOELLER, Justice

Jeffrey Marsalis appeals the Blaine County district court's decision summarily dismissing his petition for post-conviction relief from his 2009 rape conviction. In his petition, Marsalis alleged that his trial counsel was ineffective for failing to (1) challenge the testimony of the State's expert witness regarding his and the victim's blood alcohol levels, (2) present favorable eyewitness testimony at trial, and (3) properly advise him of his speedy trial rights under the Interstate Agreement on Detainers (IAD). The district court summarily dismissed each of Marsalis's claims. The Court of Appeals reversed in part and affirmed in part. The State petitioned this Court for review, which we granted. For the reasons stated below, we reverse in part and affirm in part the district court's decision.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

On October 8, 2005, Marsalis and K.G., who were acquainted through their work in Sun Valley, went out for drinks at a bar in Ketchum. Testimony from the bartender established that Marsalis ordered a total of twenty beers and four shots for the two of them, and that K.G. also ordered a few beers for herself. All of the drinks were placed on Marsalis's tab.

Following several hours of drinking, Marsalis and K.G. took a shuttle back to Marsalis's condominium in Sun Valley. The driver of the shuttle and a passenger both testified that K.G. was "drunk," almost passed out during the ride back to Sun Valley, and had difficulty walking while entering and exiting the shuttle. K.G. testified that she had no recollection of when she left the bar or how she ended up at Marsalis's residence. Upon waking later that morning, K.G. explained that she did not know where she was, but saw that Marsalis was in the bed next to her. K.G. also testified that she vomited several times that morning, experienced pain when urinating, and felt "bruised" in her vaginal area.

Later that night, K.G. reported to the Ketchum Police Department that she thought Marsalis had raped her. She also reported observing a grainy substance on the bottom of one of her shot glasses while at the bar with Marsalis. K.G. went to the hospital to have samples of her blood and urine taken. Marsalis was interviewed by the police and denied having sexual relations with K.G., but was nevertheless arrested for rape. The samples ultimately showed the presence of Marsalis's semen. However, later testing failed to show the presence of any foreign substances that could have incapacitated K.G., besides the alcohol she had consumed.

On April 21, 2006, a grand jury indicted Marsalis on one count of rape. The indictment alleged that the rape occurred: "[A]t a time when K.G. was unable to resist due to an intoxicating substance, and/or anesthetic substance; and/or at a time when K.G. was unconscious and/or asleep and/or not aware, knowing, perceiving, or cognizant that the act occurred. Idaho Code §§ 18-6101 and 6104."

While released on bail, Marsalis was convicted in Pennsylvania of a separate and unrelated sex offense. While he was housed in the Pennsylvania Department of Corrections, the Blaine County prosecutor filed a request for temporary custody of Marsalis pursuant to the Interstate Agreement on Detainers (IAD). Marsalis was returned to Idaho on August 18, 2008, and appeared in court the next day.

After a few continuances and a change of venue to Ada County, the matter proceeded to trial on April 20, 2009. Marsalis's defense at trial was that K.G. consented to sexual intercourse with him on the night in question, but could not remember it because she had blacked out. A jury ultimately convicted Marsalis of rape. The district court sentenced Marsalis to an indeterminate life sentence with a mandatory minimum of fifteen years to run consecutive to the Pennsylvania sentence. Marsalis directly appealed his conviction, which was affirmed by the Court of Appeals. *See State v. Marsalis*, 151 Idaho 872, 264 P.3d 979 (Ct. App. 2011).

Marsalis filed a timely petition for post-conviction relief. In his petition, Marsalis alleged that he was denied the right to testify[1] and the right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution. In his first sub-claim of ineffective assistance of counsel, Marsalis alleged that his trial counsel was ineffective for failing to challenge the testimony of Dr. Marc LeBeau, the State's expert witness, regarding his and K.G.'s blood alcohol levels. In his second sub-claim, Marsalis alleged that his trial counsel was ineffective for failing to call a favorable eyewitness at trial. In his final sub-claim, Marsalis alleged that his trial counsel was ineffective for failing to advise him of his speedy trial rights under the IAD.

The State moved for summary dismissal of Marsalis's petition, which the district court granted. Marsalis appealed the district court's summary dismissal of his petition. The Court of Appeals affirmed the district court's dismissal of Marsalis's second sub-claim of ineffective assistance of counsel, *i.e.*, that trial counsel was ineffective for failing to call a favorable eyewitness. However, it reversed and remanded the district court's dismissal of Marsalis's two remaining sub-claims, *i.e.*, that trial counsel was ineffective for failing to challenge Dr. LeBeau's testimony and for failing to inform Marsalis of his speedy trial rights under the IAD. The State timely petitioned this Court for review, which we granted.

## II.    STANDARD OF REVIEW

"When reviewing a case on petition for review from the Court of Appeals this Court gives due consideration to the decision reached by the Court of Appeals, but directly reviews the decision of the trial court." *State v. Chernobieff*, 161 Idaho 537, 539, 387 P.3d 790, 792 (2016) (quoting *State v. Lute*, 150 Idaho 837, 839, 252 P.3d 1255, 1257 (2011)). "This Court is not merely reviewing the correctness of the Court of Appeals' decision; rather, this Court is hearing

---

[1] Marsalis subsequently withdrew this claim.

the matter as if the case were on direct appeal from the trial judge's decision." *Gilpin-Grubb v. State*, 138 Idaho 76, 79, 57 P.3d 787, 790 (2002).

A petition for post-conviction relief is civil in nature. "Like a plaintiff in a civil action, the applicant for post-conviction relief must prove by a preponderance of evidence the allegations upon which the application for post-conviction relief is based." *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007). Yet unlike the complaint in an ordinary civil action, a petition for post-conviction relief must contain more than "a short and plain statement of the claim" that would suffice for a complaint under Idaho Rule of Civil Procedure 8(a)(2). *Id.* The petition "must present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal." *State v. Yakovac*, 145 Idaho 437, 444, 180 P.3d 476, 483 (2008) (citing I.C. § 19-4903).

Idaho Code section 19-4906 authorizes summary dismissal of a petition for post-conviction relief, "either pursuant to motion of a party or upon the trial court's own initiative." *Id.* "Summary disposition of a petition for post-conviction relief is appropriate if the applicant's evidence raises no genuine issue of material fact." *Charboneau*, 144 Idaho at 903, 174 P.3d at 873 (citing I.C. § 19-4906(b), (c)).

> On review of a dismissal of a post-conviction relief application without an evidentiary hearing, this Court will determine whether a genuine issue of fact exists based on the pleadings, depositions and admissions together with any affidavits on file and will liberally construe the facts and reasonable inferences in favor of the non-moving party. A court is required to accept the petitioner's unrebutted allegations as true, but need not accept the petitioner's conclusions. When the alleged facts, even if true, would not entitle the applicant to relief, the trial court may dismiss the application without holding an evidentiary hearing. Allegations contained in the application are insufficient for the granting of relief when (1) they are clearly disproved by the record of the original proceedings, or (2) do not justify relief as a matter of law.

*Id.* (internal citations omitted).

### III. ANALYSIS

On appeal, all of Marsalis's claims involve allegations of ineffective assistance of counsel. "The right to counsel in criminal actions brought by the state of Idaho is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Idaho State Constitution." *Dunlap v. State*, 159 Idaho 280, 295, 360 P.3d 289, 304 (2015) (quoting *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014)). "[T]he right to counsel is the right to the effective assistance of counsel." *Id.* (quoting *Murray*, 156 Idaho at 164, 321 P.3d at

714). This Court analyzes claims for ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To prevail under *Strickland*, the petitioner must show: (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *Dunlap*, 159 Idaho at 296, 360 P.3d at 305 (quoting *Strickland*, 466 U.S. at 687).

For the first prong of the *Strickland* test, the petitioner must show that "counsel's performance fell below an objective standard of reasonableness." *Yakovac*, 145 Idaho at 444, 180 P.3d at 483 (citing *Strickland*, 466 U.S. at 687–88). "[T]his Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Id.* "There is a strong presumption that counsel's performance was within the range of acceptability, particularly as to things like defense counsel's choice of witnesses, manner of cross-examination, and lack of objections to testimony, which are generally considered to fall within the realm of tactical or strategic decisions." *Thumm v. State*, 165 Idaho 405, ___, 447 P.3d 853, 861 (2019).

For the second prong of the *Strickland* test, the petitioner must show "a reasonable probability that the outcome of trial would be different but for counsel's deficient performance." *McKay v. State*, 148 Idaho 567, 570, 225 P.3d 700, 703 (2010). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Adamcik v. State*, 163 Idaho 114, 123, 408 P.3d 474, 483 (2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

Therefore, "[i]n order to survive a motion for summary dismissal, post-conviction relief claims based upon ineffective assistance of counsel must establish 'the existence of material issues of fact as to'" both *Strickland* prongs. *State v. Dunlap*, 155 Idaho 345, 383, 313 P.3d 1, 39 (2013) (quoting *Kelly v. State*, 149 Idaho 517, 522, 236 P.3d 1277, 1282 (2010)).

**A. Failure to Challenge the Testimony of the State's Expert Witnesses.**

Dr. Marc LeBeau, the Unit Chief for the FBI laboratory in Quantico, Virginia, testified for the State regarding Marsalis's and K.G.'s blood alcohol levels on the night of the incident. Dr. LeBeau did so by means of "retrograde extrapolation." Using the "Widmark formula," Dr. LeBeau estimated that K.G.'s blood alcohol level at the time Marsalis and K.G. likely had sexual

intercourse was 0.28. Dr. LeBeau then testified that according to the "Dubowski chart," K.G. would have been in a state of "stupor" with that blood alcohol level, which is associated with a loss of motor function, reduced response to stimuli, inability to stand or walk, vomiting, and, most importantly, impaired consciousness. Using the same process, Dr. LeBeau estimated that Marsalis's blood alcohol level was 0.16 and that according to the Dubowski chart, he would have been in a state of "excitement," which is associated with a loss of judgment and some memory impairment. Dr. LeBeau's testimony supported the State's allegation that Marsalis had sexual intercourse with K.G. when she was unconscious due to her excessive alcohol consumption.

In his petition, Marsalis argued that trial counsel was ineffective for failing to challenge Dr. LeBeau's testimony. According to Marsalis, trial counsel should have challenged Dr. LeBeau's testimony under Idaho Rule of Evidence 702 because "[t]here is no Idaho authority finding the Dubowski chart sufficiently reliable" and "estimation of blood alcohol levels using the Widmark formula is not scientifically reliable," especially without a known blood alcohol test result to use as a baseline. Additionally, he argued that such evidence was unfairly prejudicial under Idaho Rule of Evidence 403. Had Dr. LeBeau's testimony been admitted over a pretrial objection, Marsalis argued that trial counsel should have retained an expert witness to rebut Dr. LeBeau's testimony at trial. Marsalis also argued that trial counsel should have retained an expert witness to explain the scientific basis behind Marsalis's blackout defense, *i.e.*, that K.G. was conscious when she consented to and willingly participated in the sexual intercourse, but does not remember because she blacked out. In support of his claim, Marsalis presented the affidavits of two experts, Drs. D. Timothy Anstine and Kim Fromme. Marsalis argued that had trial counsel done any of these things, the outcome of the trial would have been different.

The district court summarily dismissed Marsalis's claim because it found that trial counsel was not deficient for failing to object to Dr. LeBeau's testimony prior to trial or for failing to retain an expert witness to rebut Dr. LeBeau's testimony at trial. The court found that an objection to the testimony under Rule 702 would have been overruled because Dr. LeBeau is an expert and "[i]t is clearly within sound trial strategy to not attack an expert who is in fact an expert" and "the substance of Dr. LeBeau's testimony is not sufficiently in question." Similarly, the court found that an objection under Rule 403 would have been overruled because the probative value of the evidence was high and outweighed any risk of unfair prejudice to Marsalis. The district court also found that trial counsel was not deficient for failing to retain an

expert witness to rebut Dr. LeBeau's testimony at trial because trial counsel sufficiently cross-examined Dr. LeBeau.

On appeal, Marsalis contends that, although the district court acknowledged his Rule 702 argument in its decision, it incorrectly interpreted his argument as challenging Dr. LeBeau as an expert in general. The actual claim—that Dr. LeBeau's testimony regarding the Widmark formula and the Dubowski chart should have been excluded under Rule 702 because both are scientifically unreliable and speculative—was not addressed by the district court, nor were the affidavits of Drs. Anstine and Fromme. In other words, Marsalis's Rule 702 argument was not based on Dr. LeBeau's qualifications, but rather on the underlying methodologies that formed the basis of his trial testimony. Marsalis also contends that trial counsel's cross-examination was insufficient because the jury did not learn that the Widmark formula and the Dubowski chart are complete speculation, and did not learn of the scientific basis behind Marsalis's blackout defense.

i. *There is a genuine issue of material fact whether trial counsel was ineffective for failing to challenge Dr. LeBeau's testimony prior to trial.*

Initially, we hold that the record supports Marsalis's claim that the district court did not accurately perceive the nature of his Rule 702 argument. In his petition, Marsalis argued that Dr. LeBeau's testimony regarding his and K.G.'s respective blood alcohol levels "should not have been admitted under I.R.E. 702 because estimation of blood alcohol levels using the Widmark formula is not scientifically reliable." In support of his claim, Marsalis submitted the affidavits of Drs. Anstine and Fromme. Without any reference to either affidavit, the district court summarily dismissed Marsalis's claim because it found that "[i]t is clearly within sound trial strategy to not attack an expert who is in fact an expert." It is apparent that the district court misunderstood Marsalis's claim as an attack on Dr. LeBeau's status as an expert in general when Marsalis's actual claim was an attack on the reliability of Dr. LeBeau's underlying methodologies. When reviewed in the light most favorable to Marsalis, the affidavits of Drs. Anstine and Fromme call into question the methodologies supporting Dr. LeBeau's testimony and potentially undermine the State's theory of the case. Accordingly, we hold that there is an issue of material fact as to whether Dr. LeBeau's testimony was based on reliable scientific methodologies.

As mentioned above, in order to prevail on an ineffective assistance of counsel claim, the petitioner must prove both prongs of the *Strickland* test, *i.e.*, deficient performance and prejudice. "Where the alleged deficiency is counsel's failure to file a motion, a conclusion that

7

the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland*] test." *Thumm*, 165 Idaho at ___, 447 P.3d at 861–62 (quoting *Dunlap*, 155 Idaho at 385, 313 P.3d at 41). Thus, the *initial inquiry* is whether a pretrial motion, had it been made, would have been denied. A motion that would have been denied by the trial court ends the inquiry. If the motion should have been granted, however, "the petitioner is still required to overcome the presumption that the decision not to file the motion 'was within the wide range of permissible discretion and trial *strategy*.' " *Id.* at 861 (emphasis added) (quoting *Estrada v. State*, 143 Idaho 558, 561, 149 P.3d 833, 836 (2006)).

As suggested above, the initial inquiry is whether a pretrial motion, had it been made by trial counsel, would have been denied by the district court. The admissibility of expert testimony is governed by Rule 702, which provides,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

"[E]xpert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict, and therefore is inadmissible." *Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009) (quoting *Ryan v. Beisner*, 123 Idaho 42, 46–47, 844 P.2d 24, 28–29 (Ct. App. 1992)). "Testimony is speculative when it 'theoriz[es] about a matter as to which evidence is not sufficient for certain knowledge.' " *Id.* (quoting *Karlson v. Harris*, 140 Idaho 561, 565, 97 P.3d 428, 432 (2004)). "In determining whether expert testimony is admissible, a court must evaluate 'the expert's ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion.' " *Id.* (quoting *Ryan*, 123 Idaho at 46, 844 P.2d at 28). Therefore, admissibility "depends on the validity of the expert's reasoning and methodology, rather than his or her ultimate conclusion." *Id.*

Here, Marsalis contends that Dr. LeBeau's estimation of his and K.G.'s blood alcohol levels through retrograde extrapolation based on the Widmark formula should not have been admitted. He asserts that determining blood alcohol levels using the Widmark formula is scientifically unreliable and speculative under Rule 702, especially when there is no known blood alcohol test result to use as a baseline, as was the case here. Marsalis also contends that the Dubowski chart should not have been admitted under Rule 702 because it, too, is scientifically unreliable.

"Retrograde extrapolation" is the "mathematical calculation used to estimate a person's blood alcohol level at a particular point in time by working backward from the time the blood [sample] was taken." *State v. Dist. Ct. (Armstrong)*, 267 P.3d 777, 780 (Nev. 2011) (quoting *Com. v. Senior*, 744 N.E.2d 614, 619 (Mass. 2001)); *see also State v. Sutliff*, 97 Idaho 523, 524 n.1, 547 P.2d 1128, 1129 n.1 (1976) ("The term extrapolation designates the process of determining the percentage of alcohol in the blood at a given number of hours prior to the time the sample was taken."). The Texas Court of Criminal Appeals provided a straightforward explanation of the metabolic principles utilized in estimating a person's blood alcohol level:

> As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. The length of time necessary for the alcohol to be absorbed depends on a variety of factors, including the presence and type of food in the stomach, the person's gender, the person's weight, the person's age, the person's mental state, the drinking pattern, the type of beverage consumed, the amount consumed, and the time period of alcohol consumption. At some point after drinking has ceased, the person's BAC will reach a peak. After the peak, the BAC will begin to fall as alcohol is eliminated from the person's body. The body eliminates alcohol through the liver at a slow but consistent rate.

*Mata v. State*, 46 S.W.3d 902, 909 (Tex. Crim. App. 2001) (internal citations omitted).

"In 1932, Swedish chemist E.M.P. Widmark first calculated absorption and elimination rates in the body, and his work still represents the benchmark for other scientists' studies today." *Id.* "Widmark created what we know today as the 'BAC curve,' which represents the rise and fall of an individual's BAC as his body absorbs and eliminates alcohol." *Id.* In the 1970s, Kurt M. Dubowski, Ph.D., developed a chart that, as explained by Dr. Anstine, "attempts to correlate the clinical signs and symptoms caused by ethanol's effects on the central nervous system." Dr. Dubowski classified these effects into stages of acute alcoholic influence/intoxication.

Only a few jurisdictions have evaluated the reliability of retrograde extrapolation, Idaho not being one of them.[2] In the jurisdictions that have considered it, most have held that retrograde extrapolation is a generally accepted scientific method, but only *when it is applied correctly*. *See, e.g.*, *State ex. rel. Montgomery v. Miller*, 321 P.3d 454, 469 (Ariz. Ct. App. 2014)

---

[2] This Court has only addressed the relevancy of retrograde extrapolation, not its reliability. *See State v. Austin*, 163 Idaho 378, 381–82, 413 P.3d 778, 781–82 (2018); *State v. Robinett*, 141 Idaho 110, 112–13, 106 P.3d 436, 438–39 (2005); *State v. Daniel*, 132 Idaho 701, 703, 979 P.2d 103, 105 (1999), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011); *Sutliff*, 97 Idaho at 525, 547 P.2d at 1130.

("[R]etrograde analysis is generally considered to be a reliable scientific discipline."); *State v. Vliet*, 19 P.3d 42, 60 (Haw. 2001) ("We take judicial notice that Widmark's formula is widely viewed as reliable."); *State v. Day*, 176 P.3d 1091, 1099 (N.M. 2008) ("[T]he State can use scientific retrograde extrapolation evidence to prove that a BAC test taken after three hours and below 0.08 shows that the defendant had an actual BAC of 0.08 or higher within three hours of driving."); *State v. Davis*, 542 S.E.2d 236, 241 (N.C. App. 2001) ("We have accepted the reliability of extrapolation evidence since 1985."); *State v. Trujillo*, 353 P.3d 609, 617 (Or. App. 2015) ("[We] conclude generally that retrograde extrapolation using the Widmark formula is scientifically valid."); *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008) ("[T]hough there is some disagreement in the scientific community, retrograde extrapolation can be reliable when applied correctly.").

To challenge the reliability of retrograde extrapolation as applied in this case, Marsalis presented the affidavits of Drs. Anstine and Fromme. Regarding the Widmark formula, Dr. Anstine, an expert on chemical testing, opined that, although the Widmark formula is generally accepted in blood alcohol concentration estimations and "gives very precise calculations, it does not automatically lead to accurate values." Dr. Anstine explained:

> The scientific assessment of an individual's actual BAC is very complex due to the wide range of both psychological and biochemical parameters unique to every individual. For this reason, it is not good scientific practice to rely too heavily on any single technique. To establish the most accurate assessment of an individual's actual BAC and its corresponding effects, it is best to look at multiple overlapping, yet still highly subjective techniques. The use of blood or breath analysis in concert with Widmark calculations helps establish a more accurate BAC and the level of intoxication.

When describing the issues in this particular case, Dr. Anstine explained:

> [T]he state did not have blood or breath analysis, nor did it have any video or audio files. To my knowledge the State relied solely on Dr. LeBeau's Widmark calculations that he based off a bar tab and eye witnesses to establish a possible level of intoxication for both Mr. Marsalis and [K.G.]. . .

Dr. Anstine also acknowledged that Dubowski himself wrote that "it becomes clear that the speculative retrograde extrapolation of the BAC to any point from an experimentally determined value must be avoided in forensic practice, or so qualified by stated assumptions that the exercise becomes pointless." *See* Dubowski, K.M., *Alcohol Technical Reports*, 1976, 5:55-63.

Regarding the Dubowski chart, Dr. Anstine opined that "[g]reat caution must be used in assessing a[n] individual[']s 'stage of alcoholic influence,' as each individual is very unique and

10

how different individuals are affected by alcohol has enormous ranges of influence." Rather, "[t]he use of eye-witness accounts along with any available video or audio files of the individual in concert with the Dubowski charts helps establish the influence of the level of intoxication." Dr. Anstine concluded that "the State relied too heavily on one single technique, specifically the Widmark formula, and from these speculative calculations made sweeping assumptions, based on the Dubowski chart, concerning the levels of intoxication and its influence on Mr. Marsalis and [K.G.]." Without knowing Marsalis's and K.G.'s specific levels of intoxication at any point in time, "any discussion concerning the 'stages of alcoholic influence' is complete speculation."

Dr. Fromme, a professor of clinical psychology and a specialist in alcohol-induced blackouts, similarly described the problems with Dr. LeBeau's reliance on the Widmark formula and the Dubowski chart:

> [T]here is no basis for the specific signs and symptoms associated with the BAC levels in the Dubowski chart. In addition, the BAC levels in each category are so large that they are not useful for any given person. The lower and upper limits differ by an average of .15 g% BAC; which is a large difference in drinking quantity. Most importantly, I have not been able to find any scientific basis for the signs and symptoms attributed to the categories of BAC in the Dubowski chart.

Based on the affidavits of Drs. Anstine and Fromme, what appears to be the bigger issue in this case is that Dr. LeBeau attempted to make a retrograde extrapolation of blood alcohol levels without a known blood alcohol test result to use as a baseline. This key fact distinguishes this case from the cases cited above that found retrograde extrapolation admissible. In each of those cases—all of which involved driving under the influence—the expert was performing retrograde extrapolation with the benefit of a known alcohol level from a breath or blood test taken sometime after the individual was pulled over. The expert then related the known alcohol level back to the time when the individual was driving. In *Mata*, the Texas Court of Criminal Appeals explained,

> [t]he court evaluating the reliability of a retrograde extrapolation should also consider *(a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test*; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking.

11

46 S.W.3d at 916 (emphasis added).

In this case, no chemical testing of the blood or breath was ever done on Marsalis or K.G. to determine their alcohol levels at the time in question. Therefore, Dr. LeBeau had to rely solely on Marsalis's and K.G.'s physical characteristics, witness accounts of their behavior, and a bar tab to determine the likely number of beverages consumed. Based on this difference alone, we hold that there is a genuine issue of material fact as to whether a motion to exclude Dr. LeBeau's testimony would have been granted by the district court.

The next inquiry, then, is whether trial counsel's decision to not pursue a pretrial motion was a strategic decision. We hold that it was not. "[T]his Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Yakovac*, 145 Idaho at 444, 180 P.3d at 483. In this case, there is no conceivable strategic justification for trial counsel's failure to pursue a pretrial motion to exclude Dr. LeBeau's testimony, especially because trial counsel barely questioned Dr. LeBeau during cross-examination, thereby leaving the jury with Dr. LeBeau's mostly unrebutted testimony. On the other hand, had trial counsel filed a pretrial motion to exclude Dr. LeBeau's testimony, and had the district court granted the motion, Dr. LeBeau's testimony would have been excluded and the only evidence the jury would have had to determine K.G.'s level of intoxication was (1) a bar tab providing the probable number of beverages consumed, (2) K.G's testimony describing the night of the incident and her symptoms, (3) Marsalis's statements describing the night of the incident, and (4) eyewitness testimony from the shuttle ride back to Sun Valley. Thus, there is a genuine issue of material fact as to whether trial counsel was deficient for failing to challenge the scientific basis for Dr. LeBeau's testimony prior to trial.

Under *Strickland*, the final inquiry is whether trial counsel's alleged deficiency prejudiced Marsalis. *See Baldwin v. State*, 145 Idaho 148, 157, 177 P.3d 362, 371 (2008) (requiring the petitioner to prove both deficiency and prejudice when asserting trial counsel was ineffective for failing to file a motion). In order to prove prejudice, Marsalis must show that there is "a reasonable probability that the outcome of trial would be different but for counsel's deficient performance." *McKay*, 148 Idaho at 570, 225 P.3d at 703. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* (quoting

12

*Strickland*, 466 U.S. at 694). In his petition, Marsalis argued that he was prejudiced by trial counsel's deficiency because there is a reasonable probability that the jury would have acquitted him absent Dr. LeBeau's testimony. Marsalis's argument has some merit. It was the State's burden to prove beyond a reasonable doubt that K.G. was unconscious or too intoxicated to consent to sexual intercourse with Marsalis. Without an expert opining that K.G. was likely unconscious when Marsalis had sexual intercourse with her because she had an estimated blood alcohol level of 0.28, there is a genuine issue of material fact as to whether the outcome of the trial would have been different.

In sum, there is a material question of fact as to whether trial counsel was deficient for failing to challenge Dr. LeBeau's testimony prior to trial, and as to whether there is a reasonable probability of a different result had Dr. LeBeau's testimony been challenged and excluded. Therefore, the district court erred in granting summary dismissal without affording Marsalis an evidentiary hearing.

> ii.     *There is a genuine issue of material fact whether trial counsel was ineffective for failing to retain an expert witness to rebut Dr. LeBeau's testimony at trial and to explain the scientific basis behind Marsalis's blackout defense.*

Marsalis argues that, had Dr. LeBeau's testimony been admitted over objection, trial counsel should have retained an expert witness to rebut his testimony at trial and was ineffective for failing to do so. This is not merely a hypothetical concern because Dr. LeBeau did in fact testify at trial. Marsalis also argues that trial counsel should have retained an expert witness to explain the scientific basis behind his blackout defense. According to Marsalis, had the jury heard that Dr. LeBeau's conclusions were derived from unreliable methods, and had the jury heard about blackouts and their causes and effects, there is a reasonable probability that the jury would have acquitted him. We hold that there is an issue of material fact as to whether trial counsel was ineffective for failing to retain an expert to address these matters. "The decision of what witnesses to call 'is an area where we will not second guess counsel without evidence of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation.' " *State v. Payne*, 146 Idaho 548, 563, 199 P.3d 123, 138 (2008) (quoting *State v. Larkin*, 102 Idaho 231, 234, 628 P.2d 1065, 1068 (1981)).

> To justify an evidentiary hearing in a post-conviction relief proceeding, it is incumbent on the applicant to tender written statements from potential witnesses who are able to give testimony themselves as to facts within their knowledge. It is not enough to simply allege that an expert should have been

secured without providing, through affidavits, evidence of the substance of the expert's testimony. Absent an affidavit from the expert explaining what he or she would have testified to, or some other verifiable information about what the substance of the expert's testimony would have been, a[n] applicant fails to raise a genuine issue of material fact.

*Self v. State*, 145 Idaho 578, 581, 181 P.3d 504, 507 (Ct. App. 2007) (internal citations omitted).

As to Marsalis's first argument, *i.e.*, that trial counsel should have retained an expert witness to rebut Dr. LeBeau's testimony, the State argued, and the district court found, that trial counsel was not deficient because it chose to address the potential weaknesses in Dr. LeBeau's testimony through cross-examination. The State also argues on appeal that, "because the proposed defense experts would only have impeached Dr. LeBeau's methodology, but not his conclusions, and because his conclusions are otherwise supported by the evidence, Marsalis did not show a likelihood that presenting the proposed experts would have affected the outcome of the trial." The State's argument is incorrect for several reasons. First, the cross-examination of Dr. LeBeau was ineffective because trial counsel did not question the scientific basis underlying Dr. LeBeau's testimony. Rather, trial counsel merely confirmed with Dr. LeBeau that (1) alcohol affects different people differently, (2) alcohol affects the same people differently, and (3) the more accurate the information, the more accurate the results will be when using the Widmark formula. On the other hand, the affidavits of Drs. Anstine and Fromme question the scientific basis underlying Dr. LeBeau's testimony, explaining that the Widmark formula and the Dubowski chart are scientifically unreliable and speculative. Second, calling into question Dr. LeBeau's methodologies necessarily calls into question the conclusions he reaches based on those methodologies, which is the precise issue Marsalis raises. Therefore, we hold that there is a genuine issue of material fact as to whether trial counsel was deficient for failing to retain a rebuttal expert witness.

As to Marsalis's second argument, *i.e.*, that trial counsel should have retained an expert witness to explain the scientific basis behind his blackout defense, neither the State in its motion for summary dismissal nor the district court in its decision addressed this argument. However, the State on appeal concedes that "[t]he only proposed testimony that does not just attempt to impeach Dr. LeBeau, but arguably is relevant to the facts of the case, is Dr. Fromme's testimony about alcohol-induced blackouts." Dr. Fromme explained in her affidavit that "[a]lcohol-induced blackouts are defined as amnesia for all or part of a drinking episode." Dr. Fromme also explained that, "[w]hile in a blackout, a person is able to engage in a range of complex activities,

14

such as . . . having sexual intercourse, but they are simply not forming memories for those events." Dr. Fromme concluded that K.G. was experiencing blackouts the night she and Marsalis had sexual intercourse. Dr. Fromme's report supports Marsalis's defense that K.G. was conscious during the sexual intercourse, but does not remember consenting to it because she was experiencing a blackout.

The State argues that the proposed testimony from Dr. Fromme is entirely consistent with Dr. LeBeau's testimony at trial, citing the trial transcript for support. However, the State's reference to the trial transcript refers to Dr. LeBeau's testimony discussing amnesia caused by CNS depressants[3] in general. There is no reference to any testimony specifically discussing alcohol-induced blackouts or amnesia. Accordingly, we hold that there is a genuine issue of material fact as to whether trial counsel was deficient for failing to retain an expert witness to discuss the scientific basis behind Marsalis's blackout defense.

Similarly, we hold there is a genuine issue of material fact as to whether Marsalis was prejudiced by trial counsel's alleged deficiencies. Marsalis maintains that, had the jury heard from an expert witness that Dr. LeBeau's testimony regarding the Widmark formula and the Dubowski chart were unreliable, and had a jury heard from an expert witness regarding blackouts, there is a reasonable probability the outcome of the trial would have been different. Marsalis has presented sufficient evidence for us to hold that there is a genuine issue of material fact regarding prejudice. First, if the jury agreed with the defense's expert that Dr. LeBeau's testimony was unreliable and speculative, they would have had no "scientific evidence" proving K.G.'s level of intoxication. Instead, the jury would have been left with a bar tab, Marsalis's and K.G.'s statements, and eyewitness testimony. Second, had trial counsel retained an expert witness to discredit Dr. LeBeau's testimony that K.G. was in a "stupor" and unconscious, the State's theory of the case would have been severely weakened. Dr. LeBeau himself testified at trial that "[w]e would not be here if this were a matter of just not remembering." Thus, having an expert witness testify that K.G. was conscious during the sexual intercourse with Marsalis, but merely did not remember it because she was experiencing a blackout, would have undermined Dr. LeBeau's testimony and, ultimately, the State's theory of the case. Therefore, there is a genuine issue of material fact as to whether Marsalis was prejudiced by trial counsel's failure to

---

[3] CNS depressants, or central nervous system depressants, are drugs that slow normal brain functioning. 47 No. 6 Crim. Law Bulletin ART 6.

retain an expert witness to rebut Dr. LeBeau's testimony and to explain the scientific basis behind Marsalis's blackout defense.

In sum, because there is a material question of fact as to whether trial counsel was ineffective for failing to challenge Dr. LeBeau's testimony and for failing to retain an expert witness to explain Marsalis's blackout defense, the district court erred in summarily dismissing this claim without reviewing the substance of the expert affidavits submitted by Marsalis. Looking at the evidence in a light most favorable to Marsalis, the nonmoving party, we conclude that Marsalis was entitled to present his evidence at an evidentiary hearing to establish whether trial counsel was deficient and whether he was prejudiced by that deficiency. Therefore, we reverse and remand this claim back to the district court for an evidentiary hearing to determine the same.

## B. Failure to Present Favorable Eyewitness Testimony.

At trial, the State called two eyewitnesses: the driver of the shuttle and a passenger in the shuttle. These witnesses testified that K.G. "was drunk, almost passed out during the cab ride and that she had trouble walking before she entered the cab and when she exited the cab in Sun Valley." Marsalis's trial counsel did not call any witnesses to rebut the testimony of the State's witnesses.

In his petition, Marsalis alleged that his trial counsel was ineffective for failing to present John Hampton, another passenger in the shuttle, at trial. According to Marsalis, there was no tactical reason for trial counsel not to call Hampton because he would have testified that K.G. was not forced into the shuttle, that there was no argument between her and Marsalis, and that when she and Marsalis arrived at their destination neither appeared to have any trouble getting out of the shuttle or walking after exiting the shuttle. Marsalis argued that, had trial counsel called Hampton, there is a reasonable probability there would have been a different result because the testimony of the State's witnesses would have been contradicted.

The district court summarily dismissed Marsalis's claim, finding that

[a] witness who wasn't paying attention and had been drinking that night is not a reliable witness at trial and it is objectively reasonable to avoid calling this person as a witness. This becomes even more true when the only sober person in the car directly contradicts the testimony of the drunk witness who wasn't paying attention.

Accordingly, the district court held that Hampton's testimony "would have had no effect on the outcome of the case."

16

On appeal, Marsalis contends that the district court erred in summarily dismissing his claim because it improperly found that failing to call the eyewitness was objectively reasonable without first addressing the Declaration of [Attorney] Charles F. Peterson, wherein Peterson declared that a reasonably prudent trial counsel would have called Hampton at trial. We hold that the district court did not err in summarily dismissing this claim.

"The decision of what witnesses to call 'is an area where we will not second guess counsel without evidence of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation.' " *Payne*, 146 Idaho at 563, 199 P.3d at 138 (quoting *Larkin*, 102 Idaho at 234, 628 P.2d at 1068). "In most cases, the court can determine whether defense counsel's challenged acts or omissions amounted to deficient performance without expert opinion from another lawyer." *Taylor v. State*, 145 Idaho 866, 871, 187 P.3d 1241, 1246 (Ct. App. 2008).

Here, in the Declaration of [Attorney] Charles F. Peterson, Peterson alleges that trial counsel was ineffective for failing to call "a critical witness's testimony at trial." Peterson states that Hampton would have countered the State's assertion that K.G. was "incapacitated and incapable of standing on her own" and that K.G. "almost passed out during the cab ride and had difficulty walking before she entered the cab and after she exited." Peterson's assertions appear to be based on an inaccurate description of Hampton's anticipated testimony.

In an interview with a private investigator, Hampton explained that he took the same shuttle back to Sun Valley as Marsalis and K.G. When asked by the investigator whether he heard any kind of argument between Marsalis and K.G., he explained that he did not. When asked whether Marsalis was physically supporting K.G. as they exited the shuttle, he explained that he was unsure because he was not paying attention to them. Finally, when asked whether he had "a visual on them" or whether he saw them "walking somewhere," he explained that he did not. Hampton also gave a statement to the Sun Valley Police Department that he did not remember any details when Marsalis and K.G. were dropped off. The only testimony that *may have* contradicted the State's eyewitnesses' testimony is Hampton's statement that he did not see Marsalis forcing K.G. into the shuttle. However, that still leaves uncontradicted the testimony that K.G. was drunk, almost passed out during the shuttle ride, and had trouble exiting the shuttle. Marsalis greatly overstates the impact of such weak evidence on the jury. Therefore, even with the support of Peterson's declaration, Marsalis failed to establish a genuine issue of

17

material fact as to whether trial counsel's decision not to call Hampton was due to inadequate preparation, ignorance of the law, or some other shortcoming. Therefore, we uphold the district court's finding that Marsalis failed to satisfy the first prong of the *Strickland* test requiring that he show deficiency in trial counsel's performance and, therefore, we need not address the second prong of the test, *i.e.*, prejudice. *See Hollon v. State*, 132 Idaho 573, 578, 976 P.2d 927, 932 (1999).

### C. Failure to Advise Marsalis of his Speedy Trial Rights under the IAD.

While Marsalis was released on bail, he was convicted in Pennsylvania of a separate and unrelated sex offense. The Blaine County prosecutor initiated transfer proceedings to get Marsalis back to Idaho to stand trial. The temporary custody documentation that was sent to the Pennsylvania prison housing Marsalis stated that the Blaine County prosecutor intended to bring Marsalis to trial "within the time specified in Article IV(c) of the [Interstate Agreement on Detainers (IAD)]."[4] Article IV(c) provides that "trial shall be commenced within one hundred twenty (120) days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance," otherwise the indictment shall be dismissed with prejudice. I.C. § 19-5001(d)(3), (5). Marsalis was returned to Idaho on August 18, 2008, and appeared in court the next day. Accordingly, the State was required to bring Marsalis to trial by December 17, 2008.

Nevertheless, Marsalis's trial was initially set to commence on January 5, 2009, well beyond the 120-day requirement set out in IAD. It is not clear why the initial trial setting did not conform with the requirements of the IAD. At a scheduling conference on December 1, 2008, held in the judge's chambers with Marsalis and counsel present, there was some discussion concerning speedy trial, the prosecutor believing he had 180 days to try Marsalis, *see* I.C. § 19-5001(c)(1),[5] rather than 120 days. The parties also discussed continuing the trial so the defense could get a change of venue and DNA results. On December 5, 2008, the parties stipulated to a continuance. On December 8, 2008, the district court issued an order continuing the jury trial. On

---

[4] The Interstate Agreement on Detainers (IAD), an interstate compact authorized by Congress and codified in Idaho at Idaho Code sections 19-5001 through -5008, "is a compact entered into by 48 States, the United States, and the District of Columbia to establish procedures for resolution of one State's outstanding charges against a prisoner of another State." *New York v. Hill*, 528 U.S. 110, 111 (2000).

[5] Section 19-5001(c)(1) provides that when the prisoner initiates the transfer proceedings, "he shall be brought to trial within one hundred eighty (180) days" after he has delivered written notice of his request for final disposition. The State initiated the transfer proceedings so this provision did not apply.

December 9, 2008, Marsalis waived his speedy trial rights "guaranteed by the Idaho and United States Constitutions and Idaho Statutory Law." Finally, on December 12, 2008, the district court entered an order granting a change of venue to Ada County. Ultimately, the trial commenced on April 20, 2009, 124 days past the deadline.

In his petition, Marsalis argued that trial counsel was ineffective for failing to inform him of his speedy trial rights under the IAD. Because trial counsel failed to inform him of his rights, Marsalis argued that his waiver of those rights was not informed and knowing. "As a result of the trial not being held within 120 days of [Marsalis's] return to Idaho and there being no valid waiver of that right, it is reasonabl[y] probable that the case against [him] would have been dismissed for a violation of the Interstate Agreement on Detainers."

In its motion for summary dismissal, the State asked the district court to dismiss Marsalis's claim because Marsalis waived his speedy trial rights under the IAD to receive additional discovery material and a change of venue. The State also argued there was "good cause" for the continuance and that, even if trial counsel incorrectly informed Marsalis that speedy trial was 180 days rather than 120 days, Marsalis "failed to show prejudice."

The district court summarily dismissed Marsalis's claim because it found Marsalis's trial counsel permissibly waived Marsalis's statutory speedy trial rights by agreeing to a continuance beyond the 120 days, citing *New York v. Hill*, 528 U.S. 110, 115 (2000) (explaining that counsel could waive his client's statutory right to a speedy trial because "[s]cheduling matters are plainly among those for which agreement by counsel generally controls."). The district court also found "good cause" on the record: "delay was needed to ensure an unbiased jury."[6] Finally, the district court found that Marsalis "would have been more severely prejudiced by a failure to continue the trial" than he was by trial counsel's alleged failure to know and advise him of the statutorily imposed deadline for trial.

On appeal, Marsalis contends that the district court erred in dismissing this claim without first providing him with twenty days' notice of proposed dismissal as required by Idaho Code section 19-4906. According to Marsalis, the district court was required to provide him with notice because it dismissed the claim on grounds not asserted by the State in its motion for summary dismissal. Specifically, the district court dismissed the claim, not because Marsalis waived his speedy trial rights, as argued by the State, but because trial counsel waived Marsalis's

---

[6] The trial court was referencing the time needed to transfer venue to Ada County.

speedy trial rights for him, as found for the first time by the district court. Thus, Marsalis asks that we reverse and remand the district court's dismissal so Marsalis can have twenty days to respond to the court's grounds for dismissal. The State contends that the district court was not required to provide notice because it relied, in part, on the grounds asserted by the State in its motion for summary dismissal. According to the State, the court's decision is "slightly, but not materially, different." Thus, the State asks that we affirm the district court's dismissal. We hold that the district court should have provided Marsalis with twenty days' notice to respond to its proposed dismissal.

Idaho Code section 19-4906 permits summary dismissal of a post-conviction petition, either pursuant to motion of a party or upon the district court's own initiative:

> (b) When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post-conviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing. *The applicant shall be given an opportunity to reply within 20 days to the proposed dismissal. . . .*
>
> (c) The court may grant a motion by either party for summary disposition of the application when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

I.C. § 19-4906(b), (c) (emphasis added).

"Where the state has filed a motion for summary disposition, but the [trial] court dismisses the application on grounds different from those asserted in the state's motion, it does so on its own initiative and the court must provide twenty days notice." *Saykhamchone v. State*, 127 Idaho 319, 322, 900 P.2d 795, 798 (1995). "When a trial court summarily dismisses an application for post-conviction relief based *in part* on the arguments presented by the State, this is sufficient to meet the notice requirements." *Kelly*, 149 Idaho at 523, 236 P.3d at 1283. In *Workman v. State*, we clarified that the "overlap" between the reasoning in the district court's decision and the State's motion for summary dismissal must be "significant." 144 Idaho 518, 524, 164 P.3d 798, 804 (2007). The district court's reasoning for dismissal cannot be "so different in kind as to transform its decision into a *sua sponte* dismissal." *Id*.

Here, the district court's dismissal of Marsalis's claim was based primarily on grounds not raised by the State in its motion for summary dismissal. The State asserted that Marsalis

20

waived his speedy trial rights under the IAD to receive additional discovery materials and a change of venue. The State also briefly mentioned that there was "good cause" for the waiver and that Marsalis "failed to show prejudice." The district court, on the other hand, did not address whether Marsalis knowingly waived his statutory speedy trial rights because it found instead that trial counsel waived his speedy trial rights for him, citing *Hill* for the first time. Moreover, although the district court mentioned "good cause" and prejudice in its decision, it did so only in passing. The court briefly concluded that there was "good cause" for the continuance because delay was needed to ensure an unbiased jury and that Marsalis "would have been more severely prejudiced" if the continuance had not been granted. Absent from the district court's reasoning is the necessary "overlap" with the State's motion that would allow this Court to uphold the district court's decision without first providing Marsalis with notice. Therefore, we remand this claim back to the district court so the court can provide Marsalis with twenty days' notice of its grounds for dismissal of this particular claim pursuant to section 19-4906(b).

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court reverses in part and affirms in part the district court's decision summarily dismissing Marsalis's petition for post-conviction relief. We affirm the district court's summary dismissal of Marsalis's claim that trial counsel was ineffective for failing to call an allegedly favorable eyewitness at trial. However, we reverse and remand the case for an evidentiary hearing on Marsalis's claim that trial counsel was ineffective for failing to challenge the underlying methodologies supporting the State's expert witness's testimony and for failing to present an expert witness to discuss the scientific basis behind Marsalis's blackout defense. We also remand the case back to the district court so it can provide Marsalis with twenty days' notice to respond to the court's grounds for dismissing Marsalis's claim that trial counsel was ineffective for failing to inform him of his speedy trial rights under the IAD.


Chief Justice BURDICK, and Justices BEVAN, STEGNER and J. Pro Tem WALTERS **CONCUR.**

21