# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 48846

| | | |
|---|---|---|
| **THOMAS K. HOOLEY,** | ) | |
| | ) | |
| Petitioner-Appellant, | ) | **Boise, September 2022 Term** |
| | ) | |
| v. | ) | **Opinion Filed: March 23, 2023** |
| | ) | |
| **STATE OF IDAHO,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| Respondent. | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Gooding County. Rosemary Emory, District Judge.

The order of the district court is <u>affirmed</u>.

Nevin, Benjamin & McKay LLP, Boise, for appellant, Thomas K. Hooley. Dennis Benjamin argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent, State of Idaho. Kenneth K. Jorgensen argued.

---

BEVAN, Chief Justice.

Thomas Hooley appeals from the district court's summary dismissal of his petition for post-conviction relief. In 2014, Hooley was convicted of aiding and abetting aggravated battery and kidnapping in the first degree. Hooley petitioned for post-conviction relief in 2019, asserting that (1) he was actually innocent and (2) the prosecution withheld favorable evidence in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court concluded that Hooley's actual innocence claim was time-barred and further concluded the claim failed on the merits. While the district court found that Hooley's *Brady* claim was timely, the court ultimately determined the claim failed on the merits. As a result of its conclusions, the district court summarily dismissed the petition without an evidentiary hearing. Hooley timely appeals. For the reasons below, we affirm the district court's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

1

Two people kidnapped Jason Given from the Apollo Motel in Twin Falls, Idaho on July 13, 2013. The kidnappers took Given to a secluded location near Gooding, Idaho, atop a hill that was out of sight of a road below. The kidnappers stunned Given with a "stun baton" and then bound Given's hands and feet using zip ties. They purportedly "interrogated" Given, hitting him in the face and threatening further use of the stun baton. At trial, it was disputed how long the "interrogation" lasted. Ryan Cunningham, one of the admitted kidnappers, testified the interrogation lasted about thirty to forty minutes. Given testified that no one asked him any questions but that "the torture" lasted around ten minutes. At this point, Cunningham stabbed Given twice, once in the back of the head and once in the temple. Cunningham then cut Given's throat twice and attempted to break Given's neck, telling Given "this is for all the times you hurt her [Autumn Boyack]." Believing that Given was dead, Cunningham and his accomplice left the scene and went back to Twin Falls. Given, however, survived the incident.

At first, Given said he did not recognize his assailants. He told his rescuer and the police officers who responded to the scene that he had been "jumped" by "two white males" he did not know. It was not until five days after the attack and three days after Given had been released from the hospital that Given told the police a different version of the story about the assault. He said the names of his two kidnappers were Ryan Cunningham and Thomas Hooley. Both men were later arrested.

Detective Derrick Walker interviewed Hooley on July 30, 2013. Hooley admitted knowing both Cunningham and Given and to seeing them both on the day of Given's assault. Even so, Hooley denied traveling with Cunningham and Given to the secluded area and participating in the attack. Walker explained to Hooley that "the first one to talk gets the deal." Hooley maintained that he did not go to the secluded area, and that he was innocent. Instead, he told Walker, "I'm thinking I'm getting set up here and I ain't liking the smell of things."

Cunningham, on the other hand, struck a deal with law enforcement. In exchange for testifying against Hooley, Cunningham received what he deemed to be a "sweetheart deal" of his own creation: Rather than serving "life plus thirty" years for first degree kidnapping and aggravated battery (with a deadly weapon enhancement), in exchange for his testimony, Cunningham pleaded guilty to aggravated battery and received a unified sentence of fifteen years, with the possibility of parole after only four years.

2

Hooley was charged with one count of aiding and abetting aggravated battery and one count of kidnapping in the first degree. A jury trial was held in July 2014. At trial, Cunningham portrayed Hooley as the mastermind of the attack on Given. Cunningham testified that: Hooley knew of the secluded area, used the stun baton on Given, "interrogated" Given, and told Cunningham to stab Given and cut his throat. Cunningham also testified that Hooley instructed him on precisely where to stab Given. During cross-examination, Cunningham explained, "[Hooley]'s the one who told me how to do it. I had never – I never stabbed anyone before, so he's the one who told me how to stick it in the back of his neck and temple." And Cunningham testified that, after the assault, Hooley told him to "shut [his] mouth" and "[c]ome up with an alibi."

Cunningham added that, when he told Given "this is for all the times you hurt her," he was referring to Autumn Boyack. At the time of the attack, Boyack and Given had a four-year-old son together. Cunningham was also intimately involved with Boyack, having met Boyack through Given. Even so, Cunningham testified that Hooley had been the one to "interrogate" Given specifically about the extent of Given's sexual relations with a different woman—with whom Hooley had apparently been romantically involved.

Given also testified at Hooley's trial. Given's version of events differed from Cunningham's. Given corroborated the fact that Hooley was the one who used the stun baton and the fact that Cunningham was the one who stabbed him and cut his throat. Given testified, however, that except for Cunningham stating that "this is for all the times you hurt her" between the two attempts to cut Given's throat, no one spoke during the attack—not to "interrogate" him, nor to give instructions on how to stab him and cut his throat. Given further testified that he waited to identify the kidnappers because he knew Cunningham was a member of a violent white supremacist gang, the Aryan Peckerwoods, and he was fearful of retaliation by Cunningham or other members of Cunningham's gang.

During closing argument, Hooley's defense counsel focused on the lack of credibility on behalf of the prosecution's two eyewitnesses: Cunningham and Given. Both were felons and admitted drug addicts, and both had at least some affiliation with a white supremacist gang. Hooley's counsel could not, however, establish an identity for an alternate perpetrator if it was not Hooley. Hooley's counsel's argument was apparently unpersuasive because the jury found Hooley guilty of both counts. For aiding and abetting aggravated battery, Hooley was sentenced to a unified sentence of fifteen years, with five years fixed. For kidnapping in the first degree, Hooley

was sentenced to a unified sentence of twenty-five years, with five years fixed. The trial court ordered the sentences to be served concurrently.[1]

### B. Procedural History

Hooley moved for a new trial alleging juror misconduct (the basis of which is not relevant to his appeal), which the trial court denied. Hooley then appealed that denial, which the Idaho Court of Appeals affirmed.[2] *State v. Hooley*, No. 42627, 2015 WL 7758496, at *1–3 (Idaho Ct. App. Dec. 2, 2015) (unpublished opinion). Hooley then filed a pro se motion for a new trial, alleging the prosecution had improperly withheld favorable material under *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court dismissed the motion as untimely under Idaho Criminal Rule 34. Hooley appealed, arguing the trial court should have considered the motion not as a motion for a new trial based on newly discovered evidence, but as a petition for post-conviction relief. The Court of Appeals again affirmed the trial court, as did this Court after Hooley petitioned for review. *State v. Hooley*, No. 46181, 2019 WL 2714067, at *1 (Idaho Ct. App. June 28, 2018) (unpublished opinion); *State v. Hooley*, 166 Idaho 417, 418, 460 P.3d 341, 342 (2020).

On September 18, 2019, while his appeal was pending before this Court, Hooley filed a pro se petition for post-conviction relief in district court, alleging that he had new evidence that proved he was innocent and that Given, Cunningham, and Boyack had "conspired to send me to prison for a crime Autumn [Boyack] and Ryan [Cunningham] committed." Hooley further requested he be appointed counsel. The district court granted Hooley's request for the appointment of counsel.

On December 2, 2019, Hooley's newly appointed counsel submitted an unsigned amended petition for post-conviction relief, which contained no mention of Hooley's actual innocence claim. Counsel reported that Hooley had refused to sign the amended petition.[3] Citing a breakdown

---

[1] This opinion will refer to the district court judge who presided over the criminal trial (Judge John K. Butler) as the "trial court" and to the district court judge who presided over the post-conviction case (Judge Rosemary Emory) as the "district court."

[2] The district court's recitation of facts states that Hooley filed a motion for a new trial and then separately appealed his sentence as being excessive. However, it appears that the district court was was incorrect: The Court of Appeals affirmed the trial court's denial of a new trial on December 2, 2015. The Court of Appeals opinion does not address a claim that Hooley's sentence was excessive, nor is a separate appeal of Hooley's sentence reflected in Idaho's appellate records.

[3] The district court's recitation of facts states that Hooley filed an amended petition on December 19, 2019. However, no filings from December 19, 2019, are in the record. Additionally, on January 2, 2020, the State filed a "Motion to Dismiss or for Extension of Time to File State's Response," in which the State asserted: "Although the 'Report of Counsel' was filed on December 3, 2019, petitioner has still failed to present a verified amended petition."

4

in the attorney-client relationship, counsel requested leave of the court to withdraw from representing Hooley. The district court granted the request and appointed Hooley a new attorney on February 5, 2020. This second attorney did not submit an amended petition either and, on May 22, 2020, also requested leave to withdraw from representing Hooley. The district court approved the request and, on June 9, 2020, appointed a third attorney to represent Hooley.

On August 26, 2020, Hooley (through his new attorney) finally filed a verified amended petition.[4] In the amended petition, Hooley asserted that he had obtained new evidence proving his innocence that had been unavailable to him at his trial in 2014, which entitled him to post-conviction relief under Idaho Code section 19-4901(a)(4). To support this claim, Hooley submitted the affidavits of two inmates, Jody Carr and Steven Bauer, who swore that, while incarcerated, they were personally told by Cunningham and Given that Hooley had been set up.[5] Hooley also asserted that, contrary to *Brady*, the prosecution had withheld an officer safety alert related to Cunningham, a "material witness," Boyack, and another individual, Nick Rice, which favored Hooley.

The State moved to summarily dismiss Hooley's amended petition on October 16, 2020. Following oral argument, the district court concluded that Hooley's amended petition was untimely but addressed each claim on the merits anyway, including whether equitable tolling should apply under what is known as the "*Schlup*[6] gateway." The district court summarily dismissed Hooley's amended petition for post-conviction relief on April 28, 2021. Hooley timely appeals.

## II.    STANDARDS OF REVIEW

A petition for post-conviction relief is civil in nature. "Like a plaintiff in a civil action, the applicant for post-conviction relief must prove by a preponderance of evidence the allegations upon which the application for post-conviction relief is based." *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007). "Yet unlike the complaint in an ordinary civil action, a petition for post-conviction relief must contain more than 'a short and plain statement of the claim' that would suffice for a complaint under Idaho Rule of Civil Procedure 8(a)(2)." *Marsalis v. State*, 166 Idaho 334, 339, 458 P.3d 203, 208 (2020) (quoting *Charboneau*, 144 Idaho at 903, 174 P.3d at

---

[4] This document is titled "Second Amended Petition for Post Conviction Relief." As previously noted, it appears from the record that no "first amended petition" was ever filed.
[5] Given was in custody during Hooley's trial on charges unrelated to this appeal.
[6] *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

873). "The petition 'must present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal.'" *Id.* (quoting *State v. Yakovac*, 145 Idaho 437, 444, 180 P.3d 476, 483 (2008)).

"Idaho Code section 19-4906 authorizes summary dismissal of a petition for post-conviction relief, 'either pursuant to motion of a party or upon the trial court's own initiative.'" *Id.* (quoting *Yakovac*, 145 Idaho at 444, 180 P.3d at 483). "Summary disposition of a petition for post-conviction relief is appropriate if the applicant's evidence raises no genuine issue of material fact." *Id.* (citing I.C. § 19-4906(b), (c)). When reviewing the "dismissal of a post-conviction relief application without an evidentiary hearing, this Court will determine whether a genuine issue of fact exists based on the pleadings, depositions and admissions together with any affidavits on file and will liberally construe the facts and reasonable inferences in favor of the non-moving party." *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007). "A court is required to accept the petitioner's unrebutted allegations as true, but need not accept the petitioner's conclusions." *Id.* "When the alleged facts, even if true, would not entitle the applicant to relief, the trial court may dismiss the application without holding an evidentiary hearing." *Id.* "Allegations contained in the application are insufficient for the granting of relief when (1) they are clearly disproved by the record of the original proceedings, or (2) do not justify relief as a matter of law." *Id.*

### III. ANALYSIS

**A.** **The district court did not err in summarily dismissing Hooley's petition for post-conviction petition as untimely.**

Hooley makes a series of interrelated arguments to contend that the district court erred in dismissing his post-conviction petition as untimely. First, Hooley alleges that, despite advocating for its application below, this Court need not decide whether the *Schlup*[7] gateway standard applies in state post-conviction cases. Second, Hooley argues that even if considered, the State has waived any argument on the *Schlup* gateway because it did not advance an argument on the standard below. Finally, Hooley maintains that he established actual innocence sufficient to warrant an evidentiary hearing.

    1. <u>This Court does not apply erroneous law simply because the State did not argue against an erroneous legal theory in its reply memorandum below.</u>

---

[7] *Schlup v. Delo*, 513 U.S. 298, 316 (1995)

Before we examine Hooley's contention that the State has waived argument on the *Schlup* gateway because it did not argue it was inapposite below, we note that this Court has already distinguished *Schlup* and held it is inapplicable to claims for post-conviction relief under Idaho law:

> The Supreme Court in *Schlup* . . . was addressing the showing required for a federal habeas petitioner to avoid a procedural bar to the consideration of his constitutional claims. *The Court was not setting forth a requirement applicable to state claims for post-conviction relief. [Schlup has no] application to these [post-conviction] proceedings, and the district court erred in relying upon [this authority].* However, "[w]here the lower court reaches the correct result by an erroneous theory, this Court will affirm the order on the correct theory." *Nampa & Meridian Irr. Dist. v. Mussell*, 139 Idaho 28, 33, 72 P.3d 868, 873 (2003).

*Fields v. State*, 151 Idaho 18, 22, 253 P.3d 692, 696 (2011) (emphasis added).

This holding colors how we view both the preservation question and the decision on the merits. *Fields* rejected *Schlup's* applicability in post-conviction cases, as we will address below. Given that conclusion, it is of note that the State argued below that Hooley's claim was untimely. Hooley conceded his claim was untimely, but argued the district court should reach the merits of his claim based on *Schlup*. Hooley failed to point-out for the district court that this Court rejected the application of *Schlup* to post-conviction cases in *Fields*. Hooley simply argued below that the district court should apply the *Schlup* gateway based on a reference to *Schlup* in a 1999 Court of Appeals opinion (*Hays v. State*, 132 Idaho 516, 520, 975 P.2d 1181, 1185 (Ct. App. 1999)). That holding distinguished *Schlup* in post-conviction cases: "Here, unlike in *Schlup,* [Petitioner's] claim is *substantive, rather than procedural*." *Hays*, 132 Idaho at 520, 975 P.2d at 1185 (emphasis in original). Beyond that, *Schlup* has no application in post-conviction proceedings. *See Fields*, 151 Idaho at 22, 253 P.3d at 696. Hooley failed to reference the *Fields v. State* authority that goes directly against his position in any of his briefing before the district court.

This Court cannot have foisted upon it a legal rule that is 180 degrees different from the *Fields* precedent that binds Hooley, the State, and this Court, simply because of poor legal draftsmanship that led to a district court decision based on what legal authority was provided to that court. *See Miller v. Idaho State Patrol*, 150 Idaho 856, 864–65, 252 P.3d 1274, 1282–83 (2011) ("[T]here is always a risk of bad decision-making" when the briefing is "inadequate" or "unhelpful.").

Because we hold that the State did not waive consideration of this standard, we next examine whether the *Schlup* gateway applies to state post-conviction proceedings.

7

2. *Schlup* does not apply to state post-conviction cases.

The issue before this Court involves a question of law: should the *Schlup* gateway be made available to post-conviction petitioners outside the limits of Idaho Code section 19-4902? How this Court applies U.S. Supreme Court opinions to our cases is a question of law. *See id*; *Rhoades v. State*, 149 Idaho 130, 132, 233 P.3d 61, 63 (2010). "This Court exercises free review over questions of law." *Fields v. State*, 149 Idaho 399, 400, 234 P.3d 723, 724 (2010).

The Supreme Court's decision in *Schlup* centered on a reviewing court's ability to hear an otherwise procedurally barred claim when the petitioner could show enough evidence of innocence that there would be a "miscarriage of justice" if his constitutional claims were not evaluated on the merits. But a *Schlup* claim is a procedural mechanism by which a *habeas petitioner* who is otherwise untimely in his filing, may obtain a key to the courthouse, as a matter of procedure, by showing that his case falls within a narrow class of cases in which the conviction would amount to a miscarriage of justice if the untimely claims were not allowed. As the United States Supreme Court noted:

> Schlup's claim of innocence, on the other hand, is procedural, rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, see *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and the withholding of evidence by the prosecution, see *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), denied him the full panoply of protections afforded to criminal defendants by the Constitution. Schlup, however, faces procedural obstacles that he must overcome before a federal court may address the merits of those constitutional claims. Because Schlup has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his first federal petition, *see McCleskey v. Zant,* 499 U.S. 467, 493–494, 111 S.Ct. 1454, 1469–1470, 113 L.Ed.2d 517 (1991), Schlup may obtain review of his constitutional claims only if he falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice," *id.,* at 494, 111 S.Ct., at 1470. Schlup's claim of innocence is offered only to bring him within this "narrow class of cases."

*Schlup v. Delo*, 513 U.S. 298, 314–15 (1995).

Schlup was a death row inmate in Missouri who filed a second habeas petition asserting he had new evidence of actual innocence. 513 U.S. at 301. Schlup had filed for habeas before, and his first petition was denied. *Id.* at 307. Because Schlup was sentenced to death, to file a second or subsequent petition, he was required, under *Sawyer v. Whitley*, 509 U.S. 333 (1992), to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have

8

found the petitioner guilty." *Id.* at 301 (quoting *Sawyer*, 509 U.S. at 336). The *Schlup* Court granted certiorari to consider whether the *Sawyer* standard should remain in place.

The Supreme Court rejected the rigid standard in place under *Sawyer*, which required a showing by clear and convincing evidence that no reasonable juror would have found the petitioner guilty. 513 U.S. at 326–27. Instead, the Court adopted "the *Carrier*[8] 'probably resulted' standard" requiring a petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327. The Court was careful to caution that a petitioner must still meet a threshold showing of *actual* innocence:

> The meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Id.* at 329.

Even more, the Court clarified that "actual innocence" under these standards refers not to a mere abstract principle, but "defining what it means to be 'innocent' of the *death penalty*[.]" *Id.* at 323 (emphasis added).

Thus, a *Schlup* gateway claim provides the procedural means for a habeas petitioner to present an untimely claim. When such a claim is alleged, the trial court reviews only a procedural claim, not a substantive claim of actual innocence. Indeed, in federal habeas cases, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a *gateway* through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993) (emphasis added). Thus, a *Schlup* claim is a procedural hurdle a habeas petitioner must get past before the court will consider the petitioner's constitutional claims that would otherwise be time barred. If successful, the court does not independently evaluate the innocence of the petitioner. Instead, it performs the "probabilistic" inquiry noted above to determine "what reasonable, properly instructed jurors would do." 513 U.S.

---

[8] *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

at 329. But a claim of innocence is required to equitably toll the statute of limitations that would otherwise apply to the supplemental constitutional claim.

*Schlup* is inapplicable here. The dissent and Hooley take a myopic view of *Fields* to extract from it a suitable interpretation that permits application of *Schlup* to post-conviction cases. But the language quoted from this Court above makes clear that we have already recognized *Schlup* applies only to federal habeas proceedings and is inapplicable to post-conviction. Our holding in *Fields* was clear: *Schlup* was "not setting forth a requirement applicable to state claims for post-conviction relief." *Fields*, 151 Idaho at 22, 253 P.3d at 696.

Even if we were to acknowledge the parallel between federal habeas and state post-conviction claims, any state habeas claims are distinct from state post-conviction proceedings. Idaho Code section 19-4203 governs who may petition for a writ of habeas corpus. That provision explains that "[h]abeas corpus shall not be used as a substitute for, or in addition to, a direct appeal of a criminal conviction or proceedings under Idaho criminal rule 35 or the uniform post-conviction procedures act, chapter 49, title 19[.]" I.C. § 19-4203(3)(g)(4). Idaho's Uniform Post-Conviction Procedure Act is found in Idaho Code section 19-4901, and it identifies a separate set of remedies that any person convicted of, or sentenced for a crime may claim.

While some states have applied the *Schlup* gateway in post-conviction cases, as the dissent suggests, many of those states do not differentiate their habeas corpus statutes from their post-conviction statutes. *See Berry v. State*, 363 P.3d 1148, 1152 (Nev. 2015) (involving a "third postconviction petition for a writ of habeas corpus"); *Lisle v. State*, 351 P.3d 725, 734 (2015) (affirming the district court's order dismissing petitioner's post-conviction petition for a writ of habeas corpus); *In re Carter*, 172 Wash. 2d 917, 933, 263 P.3d 1241, 1249 (2011) (applying *Schlup* to petitioner's personal restraint petition, under a combined habeas and post-conviction statute). Kansas and Missouri, which Hooley cited, do not apply *Schlup* to post-conviction cases at all; the cases relied on by Hooley applied the standard to the review of *habeas* cases. *See Skaggs v. State*, 479 P.3d 499, 508 (Kan. App. 2020); *Clay v. Dormire*, 37 S.W.3d 214, 218 (Mo. 2000). Idaho's post-conviction proceedings are independent civil actions authorized by statute and thus these out-of-state decisions are of little moment.

And indeed, far from harmonious at the state level, the federal courts also disagree whether the *Schlup* gateway applies to noncapital *habeas* cases. *See Poindexter v. Nash*, 333 F.3d 372, 381–82 (2d Cir. 2003) (dismissing actual innocence claim where petitioner claims that he is

actually innocent of persistent offender sentence because his three prior undisputed convictions should have counted as only one conviction for the purposes of his persistent offender sentence); *United States v. Pettiford*, 612 F.3d 270, 284–85 (4th Cir. 2010) (dismissing actual innocence claim where offender alleged that his prior undisputed conviction was improperly counted as a predicate offense to his habitual offender sentence); *Haley v. Cockrell*, 306 F.3d 257, 265 (5th Cir. 2002) (vacated and remanded for consideration of the defendant's other nondefaulted claims for comparable relief before reaching the actual innocence issue); *Embrey v. Hershberger*, 131 F.3d 739, 740–41 (8th Cir. 1997) (dismissing actual innocence claim where offender argues he is innocent of a noncapital sentence because another federal criminal statute was intended to subsume the statute under which he was sentenced); *United States v. Richards*, 5 F.3d 1369, 1371 (10th Cir. 1993) (dismissing actual innocence claim to a noncapital sentence, where offender bases innocence to enhanced sentence on a subsequent change in interpreting a sentencing law).

Thus, to apply *Schlup* in the context here—a noncapital, state post-conviction proceeding—is to stretch the interpretation of the Supreme Court's holding too far. *Schlup* has no application to a statutory cause of action that specifically limits actual innocence claims to two bases: DNA and fingerprints. *See* I.C. §19-4902(b). Accordingly, because *Schlup* is unavailable to toll the statute of limitations, the district court did not err in concluding Hooley's petition was time-barred.

Despite the district court's conclusion that Hooley's claim was time barred, the court still went on to analyze the substance of the claim. We decline to do so, since our conclusion on the timeliness question resolves the matter.

**B. The district court did not err in dismissing Hooley's *Brady* claim.**

In his amended petition, Hooley asserted that, in violation of *Brady*[9], the prosecution withheld information related to an officer safety alert related to Cunningham and Rice, which favored Hooley's defense. After the attack on Given, the Joint Investigations Division of the Bingham County Sheriff's Office and Blackfoot Police Department issued an "officer safety alert" regarding Cunningham, Rice, and Boyack. Although Hooley's trial counsel knew about the officer safety alert, the version of the alert obtained by Hooley after the trial included handwritten notes identifying Cunningham as the "primary cutter" and Boyack as a "material witness." Regarding

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

Rice, the handwritten notes stated: "Not presently wanted for this crime. Officer safety only @ [sic] this time Aryan Nations[.]"

The district court concluded that, although Hooley's petition was untimely, his *Brady* claim "appear[ed] to have been made within a reasonable time after its discovery and therefore, is not time-barred." However, the district court further concluded Hooley's *Brady* claim failed on its merits. The district court determined that evidence linking Rice to the Aryan Nations was "neither exculpatory nor impeaching" and therefore was not favorable to Hooley. The district court further concluded that Hooley "failed to demonstrate resulting prejudice from any failure by the State to produce this information." The district court reasoned that "[t]he possibility that both Rice and Cunningham were affiliated with the Aryan Nations organization does not by itself establish that Cunningham and Rice knew one another or that it would make it any more or less likely that Hooley was involved in the attack on Given." Additionally, the district court determined the officer safety alert would have been inadmissible at trial because it was not relevant to Hooley's underlying offenses. The district court noted that "[t]here was overwhelming evidence at trial supporting the jury verdict finding Hooley guilty" and ultimately concluded "Hooley [had] not shown evidence so strong that this [c]ourt would not have confidence in the outcome of the trial."

On appeal, Hooley contends the district court erred in dismissing his *Brady* claim. Hooley first asserts the evidence is favorable to him. He argues that "evidence that Rice–a known associate of Cunningham, who[m] the police suspected of harboring Cunningham after the attack on Given– is also a fellow member of the Aryan Nations suggests that it was Rice and Cunningham who attacked Given." Hooley further contends the evidence is relevant because "the identity of Cunningham's accomplice was of central consequence to the offenses Mr. Hooley was charged with."

We first address Hooley's contention that the State waived its argument that Hooley's *Brady* claim was untimely based on the "forty-two-day" rule. This forty-two-day rule comes from the "Special appellate and post-conviction procedure for capital cases," and provides "[w]ithin forty-two (42) days of the filing of the judgment imposing the punishment of death, and before the death warrant is filed, the defendant must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known." I.C. § 19-2719(3). While the State did not make this argument below, the rule does not apply here, and thus does not affect whether Hooley's petition was untimely. Below, the State moved to dismiss both of Hooley's claims under

Idaho Code section 19-4902 because the entire petition was untimely. The State's argument on appeal that Hooley's *Brady* claim was untimely under the same statute is, thus, preserved.

Even so, while Hooley did not assert his *Brady* claim within the time proscribed under Idaho Code section 19-4902, this Court has considered petitions for post-conviction stemming from a *Brady* violation within a "reasonable time" after the discovery of the violation before. *Charboneau v. State*, 144 Idaho 900, 905, 174 P.3d 870, 875 (2007). The district court also considered this "reasonable time" standard. It is not a rigid rule but one this Court considers case-by-case. Based on the facts before us, we hold that Hooley's delay was unreasonable.

Hooley learned of the notation on the officer safety report on April 2, 2020. On April 3, Hooley filed for a motion for extension of time, requesting another thirty days—not because of any newly discovered evidence—but because COVID-19 within the prison reduced his ability to work on his case. The district court granted his request and extended his time to file a second-amended petition to May 8, 2020. On May 5, 2020, Hooley filed a second request to extend time. Again, he did not mention discovering new evidence, but he requested two more weeks so that he could communicate with his counsel and because he was not feeling well. The court granted that motion, giving him until May 22, 2020. On May 22, 2020, his attorney filed a notice of withdrawal, citing a breakdown in communication with Hooley based on the attorney's ethical obligations to Hooley. The court appointed another public defender to represent Hooley in his post-conviction case on June 9, 2022. On July 1, 2022, Hooley filed a third request to extend time to file his second amended petition for post-conviction, again with no mention of newly discovered evidence. The court granted that motion the same day, giving Hooley until July 31, 2020, to file his petition. On July 24 and August 18, Hooley filed two more motions requesting more time, with no reference to the *Brady* material cited on appeal. The court granted both, and Hooley filed his amended second amended petition for post-conviction on August 26, 2020.

Thus, Hooley had nearly five months from the date he received the notations until the date he filed, and he failed to explain his delay once he did file. As noted, he filed multiple motions during that five-month period without referencing this new evidence. As this Court explained in *Charboneau*, while assessing a capital post-conviction petitioner's claim of reasonableness, "[t]his Court, in the capital context, has measured timeliness from the date of notice, not from the date a petitioner assembles a complete cache of evidence." *Charboneau*, 144 Idaho at 905, 174 P.3d at 875. The same rule applies here. Based on the facts of Hooley's case, a delay of five months was

unreasonable. Therefore, the district court's summary dismissal of Hooley's *Brady* claim without an evidentiary hearing is affirmed.

## IV. CONCLUSION

For these reasons, the district court's summary dismissal of Hooley's petition for post-conviction relief is affirmed.

JUSTICES BRODY, MOELLER, AND BURDICK, pro tem CONCUR.

STEGNER, J., dissenting.

I recognize that there is no such thing as a perfect criminal justice system. However, when mistakes are made and an innocent person is convicted, justice demands that we rectify that mistake. Accordingly, I would reach the merits of both Hooley's actual innocence claim and his claim that the prosecution suppressed favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Further, I would hold that Hooley is entitled to an evidentiary hearing on both his post-conviction claims. Because I conclude that the district court erred in summarily dismissing Hooley's petition for post-conviction relief, I respectfully dissent.

Idaho law provides a mechanism for a person who is wrongfully convicted of a crime to prove his or her innocence of that crime. The majority contends that actual innocence claims may only be brought if DNA or fingerprint evidence supports the claim. *See* I.C. § 19-4901(a)(6). However, Idaho Code section 19-4901(a)(4) provides relief when "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice[.]" In my view, nothing "requires vacation of the conviction or sentence in the interest of justice" more than actual innocence.

This is true whether the facts that establish the petitioner's innocence come to light the day after trial or a decade after trial. Rigid application of the one-year time limit would unreasonably bar a petitioner from bringing a meritorious claim of actual innocence simply because the information—which was, by definition, not available to him at trial—remained hidden from him for another year. I.C. §§ 19-4901(b), 4902(a). Such cases are, in my view, "within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice[.]'" *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). As such, I would conclude that Hooley's claim of actual innocence should be equitably tolled.

Relying on *Fields v. State*, 151 Idaho 18, 253 P.3d 692 (2011), the majority concludes this Court has already determined *Schlup* does not apply in Idaho. However, the present case is readily

distinguishable from *Fields*. Hooley's claim of actual innocence is based upon newly discovered evidence contained in the affidavits of Jody Carr and Steven Bauer. In *Fields*, the Court expressly acknowledged that the petitioner had not brought a claim based on newly discovered evidence:

> Idaho Code § 19-4901(a)(4) provides a claim for post-conviction relief when "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Fields did not allege in his application for post-conviction relief that he was making a claim based upon newly discovered evidence. Likewise, he did not argue to the district court that he was making a claim under section 19-4901(a)(4) based upon newly discovered evidence. Finally, he did not make such claim on appeal. He simply argued that such affidavits and the DNA test results established a claim of innocence under section 19-4901(a)(6).

151 Idaho at 25, 253 P.3d at 699. Thus, *Fields* is not controlling here.

Additionally, while I recognize that the United States Supreme Court's holding in *Schlup* applies to federal *habeas* petitions in capital cases, I see no reason not to extend *Schlup* to the case at bar. As I have explained, actual innocence is a distinct and colorable claim under Idaho law. An actual innocence claim does not exist under federal law. Rather, as a matter of procedure, a federal petitioner must make a showing of actual innocence in order for his or her time-barred substantive constitutional claims to be heard on the merits. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). If time-barred constitutional claims may be heard if the petitioner can show he or she is actually innocent, why should we not allow Idaho petitioners to be heard on the merits of their actual innocence claims, even past the one-year time limit? I do not disagree that constitutional claims are important; however, claims of actual innocence are at least as important, maybe even more so. I do not condone closing the doors of the courthouse for the petitioner who was wrongfully convicted. If a mistake was made at trial that caused the wrongful conviction of an innocent person, that mistake should be fixed. We should never turn a blind eye to such a claim. The day we let innocence take a back seat to finality is the day we should cease to be judges.

I would further conclude that Hooley is entitled to an evidentiary hearing on the merits of his actual innocence claim. In *State v. Drapeau*, this Court set forth four elements that must be met for a criminal defendant to be entitled to a new trial based on newly discovered evidence:

> A motion based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

97 Idaho 685, 691, 551 P.2d 972, 978 (1976) (quoting 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL s 557, at 515 (1969)). The parties agree that the district court correctly concluded Hooley had established the first and fourth elements. They narrow their dispute to whether the district court was correct in concluding Hooley had failed to meet the second and third elements – whether the evidence was material and likely to produce an acquittal.

The newly discovered evidence is, in my view, material. As pointed out by Hooley on appeal, "other than [Ryan] Cunningham's and [Jason] Given's false testimony[,] . . . [t]here was no evidence linking Mr. Hooley to the offense[.]" Cunningham and Given were the prosecution's star witnesses at Hooley's trial. They were the only two people that had been in the secluded area when Given was attacked and left for dead. The prosecution presented no forensic evidence linking Hooley to the crime. The new evidence tends to show that Given and Cunningham—the only two eyewitnesses to the attack on Given—knowingly falsified the only testimony that placed Hooley at the scene of the crime. Assuming the information in the affidavits is true, as is required when reviewing the summary dismissal of a post-conviction petition, Given and Cunningham both admitted to lying under oath at trial specifically regarding Hooley's involvement in the commission of the attack on Given. Thus, the new evidence likely has "some logical connection" to a consequential fact: whether Hooley was Cunningham's accomplice. *See State v. Ellington*, 151 Idaho 53, 74, 253 P.3d 727, 748 (2011) (explaining that the touchstone of materiality is whether the evidence has "some logical connection with the consequential facts") (quoting *Material Evidence*, BLACK'S LAW DICTIONARY 1066 (9th ed. 2009)).

I would also conclude that the newly discovered evidence, if introduced at a new trial and believed by the trier of fact, "will probably produce an acquittal[.]" *Drapeau*, 97 Idaho at 691, 551 P.2d at 978. There was precious little evidence implicating Hooley other than Cunningham's and Given's testimony. Accordingly, at a new trial, Hooley could show not only that Cunningham and Given lied on the stand and were therefore unreliable witnesses, but he could also show that they had planned to falsely testify as a plan to set him up. Accordingly, liberally construing facts and reasonable inferences in Hooley's favor and assuming the new evidence is true, the new evidence would probably produce an acquittal.

Thus, in my view, Hooley has established there is an issue of material fact as to whether he is entitled to a new trial based on newly discovered evidence. I would hold that the district court erred in summarily dismissing Hooley's actual innocence claim without holding an evidentiary

hearing. Therefore, I dissent from the majority's decision regarding Hooley's actual innocence claim.

I also dissent from the majority's decision regarding Hooley's *Brady* claim. Pointing to *Charboneau v. State*, 144 Idaho 900, 905, 174 P.3d 870, 875 (2007), the majority acknowledges that "this Court has considered petitions for post-conviction stemming from a *Brady* violation within a 'reasonable time' after the discovery of the violation before." However, the majority contends that the "nearly five months" between when Hooley received the officer safety alert notations and when he filed his amended petition was an unreasonable amount of time. I disagree. Hooley filed multiple requests to extend his filing time—none of which were opposed by the State below. Furthermore, Hooley first learned of the notations on April 2, 2020—the beginning of the Covid-19 pandemic. As evidenced by the transcripts in the record, the Covid-19 pandemic prevented Hooley's counsel from physically meeting with him at the prison. Given these circumstances, I do not find a five-month delay to be unreasonable.

Having reached the merits of Hooley's *Brady* claim, I would conclude he is entitled to an evidentiary hearing.

> The State has a duty to disclose exculpatory evidence to a defendant. This duty exists even in the absence of a request by the defendant and extends to impeachment evidence as well as exculpatory evidence. In order to establish a *Brady* violation, there must be evidence that (1) is favorable to the accused because it is either exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) was prejudicial or material in that there is a reasonable probability that its disclosure to the accused would have led to a different result. "Reasonable probability" of a different result is shown when the suppression "undermines confidence in the outcome of the trial."

*State v. Lankford*, 162 Idaho 477, 503, 399 P.3d 804, 830 (2017) (internal citations omitted).

The evidence that Nick Rice was involved in the Aryan Nations—the same gang in which Cunningham was a proud member—is favorable to Hooley. The district court reasoned that simply belonging to the same organization did not necessarily mean that Rice and Cunningham knew each other. However, on appeal Hooley points out that, not only did the two know each other, but law enforcement believed Rice had harbored Cunningham after the attack on Given. The fact that Rice was a member of the same gang as Cunningham makes it more likely that Rice and Cunningham conspired to set Hooley up and is, therefore, favorable to Hooley.

I would also conclude that the district court erred in concluding the handwritten notes were not material.

17

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "Thus, evidence is material for purposes of a due process analysis if there is a reasonable probability that disclosure of the undisclosed evidence would have produced a different outcome in the proceeding." *Id.*

Hooley describes the evidence that Rice is associated with the Aryan Nations as "the final piece of the puzzle needed to show Rice was Cunningham's accomplice as it gives Cunningham a motive to protect Rice and concoct the false story about Mr. Hooley." He notes there were other facts linking Cunningham and Rice: "Rice and Cunningham were known associates"; "The police suspected Rice of harboring Cunningham after the attack and believed Rice to be dangerous"; "Rice was in possession of the items stolen from Given, suggesting that he stole them or assisted Cunningham in the theft"; "Rice's girlfriend [Autumn Boyack] had threatened to kill Given just a week prior to the attack, providing a motive for Rice." Hooley freely admits he was already in possession of these facts, but maintains that, had he been able to present the fact Rice was a member of the same gang as Cunningham to the jury, he could have established *why* Cunningham set Hooley up and lied on the stand. In its briefing before this Court, the State proclaims it is "incredible" that "Cunningham did not intimidate Given into exonerating him, but instead into exonerating his only accomplice." It stands to reason that a jury would have the same question: Without a motive to do so, why would Cunningham lie about the identity of his accomplice? Cunningham freely admitted at trial that he was the one who physically attacked Given and was given a "sweetheart deal" in exchange for his testimony. But why would he lie about the identity of his accomplice? Liberally construing facts and reasonable inferences in favor of Hooley, it is my view that Cunningham's and Rice's membership within the same gang, the Aryan Nations, could have supplied the answer to that question for the jury. Thus, Hooley has established there is an issue of material fact as to whether there is a substantial likelihood that the result of the trial could have been different and, thus, whether he is entitled to relief under *Brady* and its progeny.

In sum, Hooley met his initial burden at the summary dismissal stage regarding both his actual innocence claim and his *Brady* claim. In my view, he should be given his day in court and

his case should not have been summarily dismissed without an evidentiary hearing. Accordingly, I respectfully dissent.