# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49786-2022

JEFFREY MARSALIS,

    Petitioner-Appellant,

v.

STATE OF IDAHO,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

**Boise, February 2024 Term**

**Opinion filed: May 21, 2024**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Jonathan P. Brody, District Judge.

The judgment of the district court is <u>affirmed</u>.

Greg S. Silvey, Silvey Law Office, Ltd., Boise, for Appellant. Greg S. Silvey argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kenneth K. Jorgensen argued.

---

ZAHN, Justice.

This case concerns Appellant Jeffrey Marsalis's petition for post-conviction relief based on ineffective assistance of counsel. A jury convicted Marsalis of rape in 2009. The Idaho Court of Appeals affirmed his conviction on direct appeal. Marsalis then filed this petition for post-conviction relief, alleging that his trial counsel was ineffective for: (1) failing to advise Marsalis that he had a 120-day speedy trial right under the Interstate Agreement on Detainers and assert that right on Marsalis's behalf and (2) failing to hire an expert witness to support Marsalis's "blackout defense." After an evidentiary hearing, the district court denied Marsalis's petition for post-conviction relief. For the reasons discussed below, we affirm the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Marsalis went out with K.G. for drinks at Whiskey Jaques, a bar in Blaine County. Marsalis opened a tab and the two drank until shortly before the bar closed at 2:00 a.m. Marsalis's

bar tab ended up containing a total of ten Coronas, ten Bud Lights, and four liquor-based shots called "Kamikazes." Marsalis drank the Coronas and two of the Kamikazes while K.G. drank the Bud Lights and the other two Kamikazes. At some point, K.G. noticed an unusual tasting granular substance in the bottom of one of the Kamikaze shot glasses. K.G. remembered consuming three or four Bud Lights and one Kamikaze shot, but otherwise had no memory of the rest of the night.

After Marsalis paid the tab at 1:38 a.m., he and K.G. exited the bar and got into a large taxi van that transported them to Marsalis's apartment. The next morning, K.G. woke up next to Marsalis on a bare mattress. They were both fully clothed. K.G. vomited several times after waking up and felt pain in her vaginal area. K.G. later reported to police that she thought Marsalis raped her. K.G. later went to the hospital where biological samples were taken. The samples were later determined to contain evidence of Marsalis's semen. A test of K.G.'s urine did not reveal the presence of any date-rape drugs. When police interviewed Marsalis, he indicated that K.G. was heavily intoxicated. Marsalis denied having sex with K.G. multiple times early in the interview. Later in the interview, however, when asked whether he had sex with K.G., Marsalis answered, "[n]ot that I know of, no." Still later in the interview Marsalis stated that he was "not going to rule out, you know, that this didn't happen at the time."

The State charged Marsalis with rape, alleging that he had sex with K.G. while she was incapable of providing consent due to her intoxication and/or because Marsalis had drugged her. Marsalis was released on bail and returned to Pennsylvania to face unrelated rape charges there. Shortly thereafter, in April 2006, an Idaho grand jury returned an indictment against Marsalis for rape in violation of Idaho Code sections 18-6101 and 18-6104. Marsalis remained in Pennsylvania where he was eventually convicted of two counts of sexual assault in 2008.

On April 17, 2008, a Blaine County prosecutor filed a request for temporary custody of Marsalis pursuant to the Interstate Agreement on Detainers ("IAD") so that Marsalis could be tried on the pending Idaho rape charge. The IAD is an interstate agreement whereby a state that has a pending criminal case against an individual who is imprisoned in another state may request that the state housing the individual transfer custody of the individual to the requesting state to face the pending criminal charges in that state. *See generally* I.C. §§ 19-5001 to 19-5008. Relevant here, the IAD requires that "trial shall be commenced within one hundred twenty (120) days of the arrival of the prisoner in the receiving state[.]" I.C. § 19-5001(d)(3). Marsalis arrived in Idaho on August 18, 2008, and was arraigned the following day. Marsalis hired private defense counsel and,

2

at Marsalis's arraignment, an attorney who practiced with Marsalis's defense counsel agreed to a January 5, 2009, trial date, which was 20 days outside of the IAD's 120-day speedy trial period.

On September 11, 2008, Marsalis's counsel filed a motion to change venue, and on October 31, 2008, he filed a motion to dismiss the Indictment. At a December 1, 2008, hearing on Marsalis's motion to dismiss the Indictment, Marsalis's counsel indicated that he would likely need a continuance of the upcoming trial date. A few days later, the parties filed a stipulation to change venue and, a few days after that, Marsalis filed a written waiver of his speedy trial rights. On December 12, 2008, the district court vacated the trial date and set a new trial date of April 20, 2009.

The trial began as scheduled. The State introduced testimony from more than a dozen witnesses, including the driver and a passenger of the taxi van that transported Marsalis and K.G. that evening. These witnesses testified that K.G. was heavily intoxicated when she and Marsalis reached Marsalis's apartment. The passenger testified that K.G. could barely walk, that Marsalis was "half dragging her," and that K.G. was "too drunk to do anything." The driver noticed that K.G. could not walk alone and Marsalis had to help her walk to, and get inside, the van. The driver testified that K.G. was leaning against the wall in the van with her eyes closed during the ride and that K.G. was "pretty much dead weight" while Marsalis was taking K.G. to his apartment. The van driver also testified that, after K.G. exited the van, she attempted to get back in but Marsalis grabbed her by the waist and said, "[n]o, we're going." According to the van driver, K.G.'s "right leg toe was pointed backward as [Marsalis] was walking her, because he was dragging her."

The State also called Marc LeBeau as an expert on central nervous system ("CNS") depressants. LeBeau testified regarding date-rape drugs, including alcohol, and how the body is impacted by those drugs. LeBeau also calculated K.G.'s and Marsalis's approximate blood alcohol concentration ("BAC") using the "Modified Widmark Formula." Using K.G.'s and Marsalis's approximate BAC, LeBeau testified to their likely respective levels of intoxication by referencing the Dubowski Chart, which describes characteristics of intoxication observed at different BAC ranges. LeBeau testified that his calculations were only estimates the State introduced to give a general idea regarding K.G.'s and Marsalis's levels of intoxication and symptoms resulting therefrom.

Marsalis's defense was that K.G. consented to having sex but could not remember consenting because she blacked out. While cross-examining LeBeau, trial counsel elicited

testimony to support Marsalis's blackout defense, namely that LeBeau's reliance on the Modified Widmark Formula and the Dubowski Chart provided mere estimations, and that K.G.'s BAC fell within two different stages on the Dubowski Chart so she could have been experiencing symptoms associated with either category. Trial counsel also got LeBeau to admit that several date-rape drugs were "not part of this case" because testing did not reveal the presence of those drugs in K.G.'s system or because the circumstances of Marsalis's case were inconsistent with the effects of those drugs.

After the State rested its case, Marsalis rested without introducing any additional evidence. In its closing argument, the State did not argue that Marsalis placed a date-rape drug in K.G.'s drink, appearing to abandon that theory of the case in favor of the theory that K.G. was so intoxicated from alcohol that she was incapable of consenting. In his closing argument, Marsalis's counsel argued that K.G. consented to having sex with Marsalis but could not recall consenting because she had blacked out. The jury returned a guilty verdict and Marsalis was later sentenced to an indeterminate life sentence with fifteen years fixed to run consecutive to the sentences Marsalis was then serving in Pennsylvania.

Marsalis appealed his judgment of conviction, but the Idaho Court of Appeals affirmed. *See generally State v. Marsalis*, 151 Idaho 872, 264 P.3d 979 (Ct. App. 2011). Marsalis then petitioned for post-conviction relief based on ineffective assistance of counsel. Marsalis argued that his trial counsel was ineffective for: (1) failing to object to LeBeau's testimony regarding his and K.G.'s blood alcohol levels, (2) failing to retain a defense expert to rebut LeBeau's testimony and explain the scientific basis behind Marsalis's blackout defense, (3) failing to call a favorable eyewitness at trial, and (4) failing to advise him of his speedy trial rights under the IAD. The district court summarily dismissed the petition after concluding that there was not a genuine issue of material fact regarding any of Marsalis's claims. Marsalis appealed the dismissal and this Court affirmed in part and reversed in part. *See generally Marsalis v. State*, 166 Idaho 334, 458 P.3d 203 (2020). Relevant here, we concluded that the district court erred in summarily dismissing the claims that: (1) trial counsel was ineffective for failing to present an expert witness to discuss the scientific basis behind Marsalis's blackout defense, and (2) trial counsel was ineffective for failing to inform Marsalis of his speedy trial rights under the IAD. *See id.*

On remand, the district court held a three-day evidentiary hearing. Regarding the IAD speedy trial issue, Marsalis's trial counsel testified that he was aware of the IAD and its time

4

requirements. However, trial counsel could not recall a conversation he had with Marsalis about the IAD's specific time requirements. Trial counsel testified that he wanted to continue the trial to change venue, challenge the grand jury indictment, and address DNA evidence.

Trial counsel also testified that he chose not to retain a defense expert to support Marsalis's blackout defense because he was concerned that if he hired an expert who disputed the State's expert testimony, then the jury would be left to guess at an explanation for K.G.'s behavior observed by the taxi driver and passenger. Marsalis's trial counsel explained that the State had pleaded two possible explanations: alcohol or a date-rape drug and the State gave no indication prior to trial that it was not going to proceed on the date-rape drug theory. Trial counsel was concerned that if he hired an expert who said K.G. was not that intoxicated due to alcohol, the jury would have inferred from her behavior that evening that Marsalis gave K.G. a date-rape drug. Trial counsel also explained that he did not retain an expert because he wanted the jurors to use their own experience regarding how much alcohol is required to blackout and did not feel it was necessary to go beyond the testimony offered by the State's expert.

During the evidentiary hearing, Marsalis's post-conviction counsel also introduced testimony from two toxicology experts, Kim Fromme and Brian Capron, and one legal expert, David Nevin. The toxicology experts testified regarding the behavioral and cognitive impact of alcohol and blackouts. Nevin testified that trial counsel was ineffective under both of Marsalis's post-conviction theories and that Marsalis was prejudiced by trial counsel's deficient performance. After the hearing, the district court issued a written decision concluding that Marsalis was not entitled to post-conviction relief on either of his ineffective assistance of counsel claims. Marsalis timely appealed.

## II. STANDARD OF REVIEW

"Post-conviction proceedings are civil in nature and therefore the applicant must prove the allegations by a preponderance of the evidence." *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004) (citing *McKinney v. State*, 133 Idaho 695, 699–700, 992 P.2d 144, 148–49 (1999)). "Upon review of a district court's denial of a petition for post-conviction relief when an evidentiary hearing has occurred, this Court will not disturb the district court's factual findings unless they are clearly erroneous." *McKinney*, 133 Idaho at 700, 992 P.2d at 149 (citations omitted). "A factual finding is clearly erroneous if it is not supported by substantial and competent evidence." *Hood v. Poorman*, 171 Idaho 176, 186, 519 P.3d 769, 779 (2022) (citation omitted). "This Court exercises

free review of the district court's application of the relevant law to the facts." *Dunlap*, 141 Idaho at 56, 106 P.3d at 382.

## III. ANALYSIS

When reviewing post-conviction claims for ineffective assistance of counsel, this Court utilizes the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Abdullah v. State*, 169 Idaho 711, 722, 503 P.3d 182, 193 (2021) (citation omitted). Under *Strickland*, an applicant "must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different." *Mitchell v. State*, 132 Idaho 274, 277, 971 P.2d 727, 730 (1998) (citing *Strickland*, 466 U.S. at 687–88).

"To satisfy the deficient performance prong, the defendant is required to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *State v. Mathews*, 133 Idaho 300, 306, 986 P.2d 323, 329 (1999) (quoting *Strickland*, 466 U.S. at 687). "In doing so, the defendant must overcome a strong presumption that counsel was competent and diligent in his or her representation of the defendant, and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Dunlap v. State*, 159 Idaho 280, 296, 360 P.3d 289, 305 (2015) (internal quotation marks and citations omitted). "To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Id.* (alteration in original) (citation omitted). Critically, "this Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review." *State v. Dunlap*, 155 Idaho 345, 384, 313 P.3d 1, 40 (2013) (citation omitted).

To satisfy the prejudice prong, "there must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Abdullah*, 169 Idaho at 722, 503 P.3d at 193 (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 722–23, 503 P.3d at 193–94 (quoting *Strickland*, 466 U.S. at 694). A defendant must meet both *Strickland* prongs to obtain post-conviction relief based on ineffective assistance of counsel. *Id.* at 722, 503 P.3d at 193 (citation omitted). Thus, a "court need not determine whether counsel's performance was deficient before examining the

prejudice suffered by the defendant as a result of the alleged deficiencies." *Dunlap*, 159 Idaho at 297, 360 P.3d at 306 (quoting *Strickland*, 466 U.S. at 697).

Marsalis argues that his trial counsel was ineffective because he was unaware of the IAD's 120-day speedy trial requirement, improperly agreed to waive that right because he was not aware it existed, and also failed to properly counsel Marsalis before Marsalis waived his speedy trial rights. Marsalis also contends that trial counsel was ineffective for failing to hire an expert to support his blackout defense at trial. We need not reach the question of whether trial counsel's performance was deficient because we hold that Marsalis failed to demonstrate prejudice on each of his claims. Accordingly, we affirm the district court's denial of Marsalis's petition for post-conviction relief.

## A. Marsalis failed to establish prejudice on his ineffective assistance of counsel claim concerning the IAD's 120-day speedy trial timeframe.

Marsalis argues that trial counsel was ineffective because he was unaware of the IAD's 120-day speedy trial requirement, which is shorter than the 6-month speedy trial timeframe provided in Idaho law. *Compare* I.C. § 19-5001(d)(3), *with* I.C. § 19-3501(2). He contends that trial counsel's performance was prejudicial because, had trial counsel been aware of and asserted Marsalis's 120-day IAD speedy trial right, there is a reasonable probability that the State would not have been able to try him within 120 days and the charges against him would have been dismissed with prejudice.

The district court found that trial counsel was aware of the 120-day speedy trial clock but was not thinking about it specifically in this case. Nonetheless, the district court concluded that Marsalis's right to a speedy trial under the IAD was validly waived either when he signed a written waiver of his speedy trial rights or because trial counsel waived the right on Marsalis's behalf. The district court also concluded that Marsalis failed to demonstrate prejudice because, had Marsalis's trial counsel asserted the 120-day speedy trial right, the trial may have begun on time and alternatively, there would have been good cause to extend the 120-day clock given Marsalis's pending motions to dismiss the indictment and to change venue.

Marsalis argues that the district court erroneously concluded that Marsalis's IAD speedy trial right was validly waived. Marsalis contends that the IAD requires any waiver to be done in open court, which demonstrates there was not an effective waiver in his case. Marsalis also argues that trial counsel's actions prejudiced him under *Strickland*'s second prong, despite the district

court's conclusory statements that, had counsel asserted Marsalis's speedy trial rights, the State may have been able to try him within the 120-day period.

The State argues that Marsalis waived his right to a speedy trial on multiple occasions. The State also argues that Marsalis was not prejudiced because there is no evidence in the record suggesting that the State could not have tried Marsalis within 120 days.

We need not address Marsalis's arguments concerning the effectiveness of his trial counsel or the validity of his waiver of his speedy trial rights because, even if trial counsel's performance was deficient and Marsalis's IAD speedy trial right was not waived, Marsalis has not shown "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Abdullah*, 169 Idaho at 722, 503 P.3d at 193 (citation omitted).

Marsalis is correct that the IAD requires that "trial shall be commenced within one hundred twenty (120) days of the arrival of the prisoner in the receiving state[.]" I.C. § 19-5001(d)(3). If the defendant is not tried within 120 days, charges must be dismissed with prejudice. I.C. § 19-5001(e)(3). However, the trial court can extend that timeframe: "[F]or good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." I.C. § 19-5001(d)(3).

Marsalis arrived in Idaho on August 18, 2008, and was arraigned the following day. At his arraignment, Marsalis was represented by another attorney at trial counsel's firm. That attorney agreed to a January 5, 2009, trial date, which was 20 days outside the 120-day IAD deadline. The record does not contain a transcript of Marsalis's arraignment, but it appears from the court minutes that the IAD 120-day timeframe was not discussed at that time.

Marsalis's trial counsel then filed a motion to change venue on September 11, 2008, and a motion to dismiss the Indictment on October 31, 2008. At the December 1, 2008, hearing on Marsalis's motion to dismiss the Indictment, trial counsel stated that he had just received new discovery from the State and that he and the prosecutor would likely be stipulating to a change of venue. Given these circumstances, trial counsel indicated that it may be necessary to continue the upcoming trial date. Trial counsel, the prosecutor, and the trial court judge then took these matters up in chambers to discuss how the case should proceed.

The transcript of the in-chambers discussion reveals that trial counsel, the prosecutor, and the trial court judge were all operating on a 180-day timeline instead of the applicable 120-day timeline. Although not applicable here, the IAD provides a 180-day speedy trial deadline when a

8

defendant, as opposed to the State, requests disposition of pending out-of-state charges. *See* I.C. § 19-5001(c)(1). It appears that the parties were operating under this incorrect timeline. After discussing the discovery and change of venue issues, the trial court stated that it would wait for a motion for a continuance or change of venue before deciding whether to vacate the upcoming trial date.

Four days later, on December 5, 2008, the parties filed a stipulation to change venue. On December 9, 2008, Marsalis filed a written waiver of his speedy trial rights. Then, on December 12, 2008, the trial court vacated Marsalis's initial trial date and set a new trial for April 20, 2009.

Marsalis asserts his trial counsel was ineffective because he failed to assert the 120-day speedy trial requirement at the December 1, 2008, hearing on Marsalis's motion to dismiss the Indictment. The 120-day speedy trial period expired 15 days later, on December 16, 2008. Marsalis argues that, had trial counsel been aware of the 120-day deadline, trial counsel would not have agreed to a continuance and would have instead insisted that Marsalis be tried before the 120-day deadline expired. Based on the facts found by the district court, we hold that Marsalis failed to demonstrate prejudice because there is not a reasonable probability that the trial court would have ultimately dismissed the State's case against Marsalis under the IAD.

The district court found that, although ultimately unsuccessful, Marsalis's motion to dismiss the Indictment was meritorious and that it was in Marsalis's interest to change venue, which required a continuance. For this reason, the district court found that, had trial counsel been aware of and asserted Marsalis's 120-day IAD speedy trial right, the trial court would have concluded there was good cause to continue the trial beyond the 120-day period. The district court therefore concluded that Marsalis failed to establish he was prejudiced by his trial counsel's failure to assert the 120-day speedy trial deadline.

Marsalis argues that the district court erred because his motions to dismiss the Indictment and change venue only led to a continuance because trial counsel failed to timely pursue those motions. Marsalis, therefore, argues that there would not have been good cause to continue the trial beyond the 120-day deadline. He also argues that his motion to dismiss the Indictment was unsuccessful, so the district court should not have concluded that Marsalis benefitted from an ultimately unsuccessful motion. We disagree.

Marsalis fails to cite evidence in the record supporting his assumption that trial counsel would have abandoned his pending motions to assert Marsalis's IAD speedy trial right or that trial

counsel could have resolved the pending motions sooner. Trial counsel filed the motion to change venue on September 11, 2008, and the motion to dismiss the Indictment on October 31, 2008. Marsalis essentially argues that trial counsel's performance was also deficient because he should have resolved these motions sooner. However, Marsalis did not specifically plead the failure to seek an earlier hearing on these motions as deficient performance, nor has he pointed to evidence supporting his contention that this argument negates the district court's finding that the trial court would have found good cause for a continuance.

We are unconvinced that there was a reasonable probability that, had Marsalis suddenly asserted his IAD speedy trial right approximately two weeks before the deadline was set to expire, the trial court would have moved up the trial date and insisted that the State go to trial on a mere two weeks' notice. Marsalis had agreed to a trial date outside the 120-day timeframe and allowed the case to proceed for months. He had two motions pending at the time of the December 1 hearing. The district court later granted his motion to change venue. Marsalis's trial counsel indicated at the December 1 hearing that he had just received discovery from the State and was reviewing it. Marsalis has pointed to no evidence in the record indicating that there was a reasonable probability that the trial court would have insisted that the case be tried within two weeks of the December 1 hearing.

We also agree with the district court's conclusion that, even if the trial court had expedited the trial on two weeks' notice, Marsalis admitted no evidence that the State would have been unable to try the case. Marsalis emphasizes that several of the State's critical witnesses had to travel from out of state for trial. He argues that moving the trial date up on short notice would have created logistical issues for the State and questions whether the State's witnesses would have been available. However, this is mere speculation on Marsalis's part; he does not point to evidence in the record suggesting the State's witnesses would not have been available. Marsalis argues that the State failed to present evidence that it would have been ready for trial in two weeks, but it was Marsalis's burden to demonstrate prejudice. *See, e.g.*, *Abdullah*, 169 Idaho at 722, 503 P.3d at 193 ("[T]he applicant 'for post-conviction relief must demonstrate that . . . there is a reasonable probability that, but for counsel's errors, the result would have been different.'" (citation omitted)).

Based on the foregoing, we conclude that Marsalis failed to demonstrate a reasonable probability that the charges against him would have been dismissed with prejudice had trial counsel asserted his IAD speedy trial rights at the December 1 hearing. Accordingly, Marsalis has

not shown prejudice under *Strickland*'s second prong, and we affirm the district court's dismissal of his IAD ineffective assistance of counsel claim.

**B. Marsalis failed to establish prejudice on his ineffective assistance of counsel claim concerning his trial counsel's failure to retain an expert witness.**

Marsalis argues that trial counsel's performance was deficient because trial counsel failed to hire an expert witness to support his blackout defense at trial. We again affirm the district court's decision dismissing the claim because, even if he were able to establish that the decision not to retain an expert witness constituted deficient performance, Marsalis failed to demonstrate that the decision prejudiced him.

The district court found that, while additional testimony from an expert like Marsalis's post-conviction expert Dr. Fromme would have been beneficial, Marsalis ultimately failed to demonstrate that it was reasonably likely that testimony from such an expert would yield a different jury verdict. The district court found that Marsalis's legal expert overstated the significance of Marsalis's blackout defense considering the other evidence presented concerning K.G.'s extreme intoxication. Specifically, the district court found that the most critical evidence against Marsalis was eyewitness testimony regarding K.G.'s severely intoxicated condition shortly before Marsalis took her into his apartment. While a more persuasive presentation regarding the scientific basis of Marsalis's blackout defense could have been helpful to educate the jury on the blackout defense, the district court found that the jury was sufficiently educated on blackouts by LeBeau's testimony and additional expert testimony would not likely have led to a different result.

Marsalis argues that, with the benefit of Fromme's testimony, there is a reasonable probability that the jury would have acquitted Marsalis. Marsalis argues that Fromme could have undermined LeBeau's testimony concerning K.G.'s level of intoxication because Fromme testified at the evidentiary hearing that the Modified Widmark Formula and Dubowski Chart, on which LeBeau's estimates were based, are unreliable. Marsalis also argues that Fromme's testimony would have significantly improved his blackout defense by providing a scientific basis for the theory, which would have helped the jury better understand his defense.

The State argues that Fromme's testimony, while perhaps marginally beneficial, fails to demonstrate a reasonable probability that the jury would have acquitted Marsalis. The State contends that the district court's findings regarding Fromme's testimony support the district court's conclusion that Marsalis was not prejudiced.

11

We begin with Marsalis's argument that an expert would have called into question LeBeau's testimony regarding K.G.'s level of intoxication. Marsalis takes issue with LeBeau's reliance on the Modified Widmark Formula, which LeBeau used to estimate K.G.'s BAC based on the number of drinks reported on Marsalis's bar tab. Marsalis argues that LeBeau then used the Modified Widmark Formula results to estimate K.G.'s behavioral impairment using the Dubowski Chart. Marsalis argues that these compounding estimates meant that LeBeau's testimony regarding K.G.'s impairment was, at best, speculative and that Fromme's expert testimony could have demonstrated that to the jury.

Marsalis's argument conflicts with the district court's findings, which he has not argued are clearly erroneous. The district court found that the "bar tabulation created by the bartender at Whiskey Jaques is a reliable source to determine the amount of alcohol consumed by K.G. and Marsalis." The district court found that "Dr. LeBeau's estimated BACs for K.G. and Marsalis [using the Modified Widmark Formula] were presented in a scientifically acceptable range." The district court found that LeBeau was an expert qualified to testify that the Dubowski Chart and Modified Widmark Formula are scientifically sound.

Even if we construe Marsalis's argument as a challenge to the district court's factual findings, Marsalis's own expert forensic toxicologist, Brian Capron, testified that LeBeau's Modified Widmark Formula calculations were accurate. Further, Fromme admitted that she had used the Modified Widmark Formula to provide expert testimony of an estimated BAC in one of her cases. Although Fromme criticized the Dubowski Chart, she admitted that it has been repeatedly reproduced in toxicology textbooks. Capron admitted that the behavioral impairment symptoms eyewitnesses reported K.G. was exhibiting were consistent with LeBeau's BAC estimation when compared to the symptoms reported on the Dubowski Chart. Thus, the district court's findings regarding LeBeau's use of the Modified Widmark Formula and the Dubowski Chart are supported by substantial and competent evidence.

The record also supports the district court's finding that "LeBeau did not utilize the modified Widmark formula to present precise results," and instead presented scientifically acceptable *estimates* of K.G.'s and Marsalis's BACs. While Marsalis contends that Fromme could have provided testimony emphasizing that LeBeau's calculations were mere estimates, which Marsalis maintains would have reduced the weight that the jury gave to LeBeau's testimony, the jury was already apprised of this information by LeBeau himself:

> Well, if we don't have a blood sample with measurable amounts of alcohol in it, we can take advantage of a formula that's been used by forensic toxicologists since the 1930s. It's called the "Widmark Calculation" that *allows us to estimate* what level of – well, I'm not sure what level, but *to estimate* how much alcohol somebody would have in their blood given a particular drinking scenario.

(Emphasis added.) While LeBeau was giving a PowerPoint presentation, LeBeau emphasized that, "as it says at the top [of the PowerPoint slide] that these are estimates, and I don't want to mislead anybody. The more accurate the information that we put into [the Modified Widmark Formula], the better the result here."

Because the jury was already aware that LeBeau was estimating K.G.'s BAC, Marsalis cannot demonstrate a reasonable likelihood that Fromme's testimony would have had such an impact as to result in a different trial outcome. This is particularly true when Fromme's expert testimony is weighed against the other evidence the jury was presented inculpating Marsalis in the rape.

The State elicited testimony from the taxi van driver and another passenger who rode with Marsalis and K.G. during their return trip from the bar to Marsalis's apartment. These witnesses testified that K.G. was heavily intoxicated shortly before she and Marsalis reached Marsalis's apartment. The passenger testified that K.G. could barely walk, that Marsalis was "half dragging her," and that K.G. was "too drunk to do anything." The van driver testified that K.G. was leaning against the wall in the van with her eyes closed during the ride and that K.G. was exhibiting signs of severe intoxication while Marsalis was dragging K.G. to his apartment. The van driver's testimony describing the events shortly after K.G. and Marsalis exited the van, and right before they entered Marsalis's apartment, is particularly compelling:

> Q. And once the defendant and the female had exited the van, what happened next?
>
> A. She tried to get back in the van.
>
> Q. And how did that happen?
>
> A. She pitched herself forward. Her feet weren't working, so she ended up actually going this way (demonstrating) over the seat with her body.
>
> Q. So was this before the door was shut?
>
> A. Uh-huh -- yes.
>
> Q. And what happened after she had pitched herself forward onto the seat?
>
> A. She said that she wanted to get back in.
>
> Q. And what happened then?

A. He said, "No, we're going."

Q. Did he touch her in any way?

A. Yes. He put his hands around her waist, on her hips.

Q. And what did he do?

A. Pulled back.

Q. Was he able to remove her from the van?

A. Uh-huh. She finally let go of the seat.

Q. And what happened after that?

A. He supported her. Her knees buckled. And the other guys jumped forward to ask him if he needed help. And he said "no" that he had it. They offered to help take the girl in -- help him take her in, not knowing that they weren't a couple.

. . . .

Q. Did you have any additional contact with [Marsalis] after you had initially shut the door and drove off?

A. Yes. There was [sic] some comments in the car. I said, "Wow, she looks pretty bad off. . . . Do you think we should offer some help -- some more help?" Because they offered to help him the first time and he refused. But she was really -- she wasn't even doing as well as she was on Main Street leaning into him. She was pretty much dead weight.

And I asked [one of the passengers], "Maybe we should just offer him again to help him." And we opened the window and we said, "Are you sure you don't want help?" And he said, "No, go on." And my nephew said at that point that he would never get that drunk as that girl.

Q. Were you able to observe [Marsalis] escorting the female towards the condominium complex?

A. Yes.

Q. How were they moving along?

A. Slow. He was having to support her weight.

Q. And how was he doing that?

A. Her feet -- when he was supporting her weight, he had it up under her arm, and he was half dragging her. Her toes were pointed backward -- her right leg too was pointed backward as he was walking her, because he was dragging her.

During the post-conviction evidentiary hearing, Marsalis's trial counsel explained that he knew the eyewitness testimony was "the worst part of the whole case." Trial counsel spoke with some of the jurors after trial who confirmed what effect the eyewitness testimony had on the jury:

14

Okay. So -- and I talked to some jurors -- well, two jurors after the case was over, and they confirmed what I had suspected, which is the worst part of the case for Mr. Marsalis was the evidence of the cab driver -- the taxi driver that dropped off -- or bus driver that dropped off [Marsalis] and [K.G.] at his sidewalk to walk up to his condo.

And when he was walking with [K.G.] in front of the bus and she was waiting there as the driver, he was basically dragging her. And the one part of it that was really bad was that the bus driver said that her foot -- one of her feet was dragging sort of sideways as he's helping her into the -- up the sidewalk, into his house. And that stuck in their mind [sic] and it stuck in my mind.

The eyewitness testimony from the van driver and passenger was corroborated by Marsalis's own statements. An audio recording of Marsalis's interview with law enforcement was published to the jury. In the interview, Marsalis stated that K.G. was "having tons and tons of drinks" and was "chugging them all night long" to the point that "she was brilliantly intoxicated[.]" When Marsalis and K.G. got back to his apartment, Marsalis explained that K.G. was so intoxicated that she was vomiting "all night long":

> I put her down on my bed so she said she's feeling really sick. And then after that she was still throwing up and stuff and she threw up all over the place. Threw up on my sheets, threw up on the pillow, she was vomiting all night long. And, so, basically, you know, I had the towel and I was taking care of her. I wiped off her mouth and her face. She's vomiting, on the, all over the bed.

As the above evidence illustrates, the State introduced strong evidence indicating that K.G. was extremely intoxicated, so much so as to render her incapable of consenting. The jury would only accept Marsalis's blackout defense if it thought K.G. was capable of consenting. We agree with the district court's conclusion that Marsalis failed to demonstrate a reasonable likelihood that Fromme's testimony questioning LeBeau's BAC estimates would have undermined the eyewitness testimony concerning K.G.'s level of intoxication to such a degree as to result in a different trial outcome.

Turning to Marsalis's second argument, Marsalis argues that his trial counsel's reliance on LeBeau's testimony to support Marsalis's blackout defense did not sufficiently educate the jury on how blackouts occur and affect someone. Marsalis argues that, had his trial counsel retained an expert to provide a more scientific explanation concerning blackouts, there is a reasonable probability that the jury would have rendered a not guilty verdict.

Again, Marsalis's arguments conflict with the district court's factual findings, which are supported by substantial and competent evidence. The district court found that hiring a defense

expert would not have significantly improved Marsalis's blackout defense. The district court also found that the blackout information LeBeau provided was not radically different from what Fromme testified to at Marsalis's evidentiary hearing.

During the State's direct examination at Marsalis's trial, LeBeau explained that CNS depressants, which include alcohol, can cause memory problems even though a person remains conscious:

> Q. Now can you discuss the effect that a CNS depressant has on a person's mental capability?
>
> A. Well, yes, I certainly can. There's really two things with memory that you deal with, with a CNS depressant. First, a number of CNS depressants cause a type of amnesia. And most of the time when we think about amnesia, we think about what's called "retrograde amnesia," where you maybe once know your name, but you got a bump on your head and you suddenly can't recall that or where you live. You forget that. That's a memory you had at one point, and now you can no longer recall it. That's not the type of amnesia, though, that we're talking here. This is what's known as "anterograde amnesia" that certain CNS depressants cause.
>
> And what these drugs are able to do is prevent you from recording the memory in your brain. So it doesn't matter with hypnosis or -- you know, a month later you're not going to suddenly recall this, because it's not actually recorded into your brain. It's kind of similar to -- remember the old types at VCRs we had where you push a "play" and "record" button at the same time to get it to actually record the show you wanted to watch? And if you didn't hit both buttons -- maybe you just hit the "play" button. Well, you're looking at that VCR and it says to you -- well, the lights are on; you can hear the machine running. But when you go back to watch that show, it's not there.
>
> It's very similar to that. Because a person that's under the influence of these drugs doesn't have to, necessarily, be completely knocked out to have this anterograde amnesia. They are going to be visibly intoxicated, if you will, by the drugs.
>
> But an onlooker might look at that individual and say, "Well their eyes were open, so they must be able to recall that memory." That's not necessarily the case, again, because of this anterograde amnesia. So that's the one type of memory problems you may have with a CNS depressant.

Fromme provided a more nuanced explanation of blackouts at the evidentiary hearing, which the district court found could have been more beneficial for the jury when presenting Marsalis's blackout defense:

> Q. All right. Well, let's talk about blackout because we've used that term quite a bit today in the courtroom.
>
> What is exactly a blackout?

A. Blackout is amnesia for all or parts of a drinking event. While in a blackout, the person is fully conscious, engaged with their environment, walking, talking, making voluntary decisions and actions. They're just not forming memories for those activities.

However, Fromme conceded on cross-examination that a person in a blackout is just as capable of not consenting as they are of consenting. The issue of consent was the ultimate issue the jury was asked to decide at trial and Fromme's testimony indicated that if K.G. was in a blackout state, she was just as capable of not consenting to sex as she was capable of consenting and not remembering it. So, while Fromme testified that people generally can be capable of making voluntary decisions in a blackout, Fromme declined to opine whether K.G. was capable of making voluntary decisions when Marsalis had sex with her:

Q. And in the trials that you've testified as an expert, is it generally your testimony that a victim is capable of consenting to sexual activity while in a blackout?

A. I leave that to the trier of fact. That's usually the ultimate question. What my testimony has to do with is what capabilities can a person maintain while in a blackout. What do they look like, what can they do, what have they done, and how do they not remember it.

Q. So your testimony is -- but in a case regarding a specific person, we're calling a victim here -- and your testimony is prominently or generally regarding that person's capability of consenting while in a blackout?

A. That's the question presented to the jury to decide. My role is to educate about the effects of alcohol and blackouts and what is and is not impaired during a blackout.

It's for the trier of fact to then take that scientific basis and apply it to the question that they're being asked about consent.

We agree with the district court that Marsalis failed to demonstrate prejudice. The district court recognized that Marsalis's trial counsel was threading a challenging needle by asserting a blackout defense: the jury needed to believe K.G. was intoxicated enough to experience a blackout but not so intoxicated that she was incapable of consenting. As quoted above, Fromme's testimony did not address whether K.G. was capable of consenting, which she made clear at the evidentiary hearing. Moreover, Fromme admitted on cross-examination that K.G. was exhibiting symptoms of a "very intoxicated person[.]"

When viewed in context, Fromme's testimony is not as drastically different from LeBeau's testimony as Marsalis argues on appeal. Marsalis claims that a defense expert's explanation of the scientific basis for blackouts would have caused the jury to disregard the evidence supporting the

State's assertion that K.G. was so intoxicated as to be incapable of giving consent. In the face of strong eyewitness testimony that K.G. was severely intoxicated and LeBeau's testimony concerning blackouts, we agree with the district court that Marsalis failed to demonstrate a reasonable probability that, if Fromme had provided some additional explanation concerning the scientific bases for blackouts, the jury would have found him not guilty. Accordingly, we affirm the district court's conclusion that Marsalis failed to demonstrate prejudice under *Strickland*'s second prong on his ineffective assistance claim concerning his trial counsel's failure to retain an expert witness on blackouts.

## IV.    CONCLUSION

For the foregoing reasons, the district court's judgment dismissing the petition for post-conviction relief is affirmed.

Chief Justice BEVAN, Justices MOELLER and MEYER, and Pro Tem Justice NORTON CONCUR.